## OKIN v. SECURITIES AND EXCHANGE COMMISSION.

### No. 287.

Circuit Court of Appeals, Second Circuit.

Aug. 2, 1943.

Samuel Okin, of New York City, pro se, petitioner.

Theodore L. Thau, Atty. for Securities and Exchange Commission, of Philadelphia, Pa. (John F. Davis, Sol., and Jesse J. Holland, Atty. for Securities and Exchange Commission, both of Philadelphia, Pa., on the brief), for respondent.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Petitioner, owning 9,000 out of 5,250,358 outstanding shares of common stock of Electric Bond and Share Company, which, in turn, owns 46.6% of the common stock of National Power & Light Company, sought permission of the Commission to intervene in opposition to an application by National for authority to sell all the outstanding securities of its wholly-owned subsidiary, West Tennessee Gas Company. The Commission referred this request to its trial examiner appointed to conduct the hearing on the application; and the latter at the opening of the hearing allowed petitioner limited participation, with cross-examination of witnesses, pending later definitive ruling on his request.[1] The hearing then continued during two days and, after an interval, during a day and a half more, with constantly increasing acrimony, which finally ended in the order of the examiner excluding petitioner from the hearing and, upon his refusal to leave the room, the closing of the hearing. Petitioner then moved before the Commission that all the rulings of the examiner be reversed, and that the hearings be reopened before the Commission or a Commissioner, with an assistant appointed to represent the Commission by the Attorney General or the

---

[1] The trial examiner allowed cross-examination of witnesses by the petitioner over objection of the Commission's counsel and did not thereafter rule expressly upon the request, though he eventually excluded petitioner from the hearing, as stated in the text. The Commission in its opinion states that petitioner was granted the privilege of limited participation in the proceeding, under Rule 17 of its Rules of Practice.

Solicitor General, and that the United States District Attorney for the Southern District of New York have an assistant present at the reconvened hearing. Thereafter, on March 26, 1943, the Commission filed its considered opinion and order approving the sale and denying petitioner's motion. Holding Company Act Release No. 4200. Petitioner seeks review of this order.

The sale by National of its interest in West Tennessee was sought as a step in compliance with the order of the Commission dated August 23, 1941, issued pursuant to the provisions of § 11(b) (2) of the Act, 15 U.S.C.A. § 79k(b) (2), directing the dissolution of National. See Electric Bond and Share Co. et al., 9 S.E.C. 978. West Tennessee has outstanding its note, now overdue, to National in the principal amount of $585,000, and 100,000 shares of nonpar capital stock also owned by National, having a stated book value of $175,000. These investments by National in West Tennessee represent substantial reductions from earlier investments, brought about largely by the sale by West Tennessee of its electric properties to the Tennessee Valley Authority and to the various municipalities wherein its electric operations were conducted, and the disposal of its street railway, ice and water properties. West Tennessee now owns and operates facilities for the distribution of natural gas in Jackson, Tennessee, and five neighboring communities, serving approximately 45,000 inhabitants. It purchases all its natural gas from Memphis Natural Gas Company, a nonaffiliate. The sale, approved by the Commission, is to Equitable Securities Corporation of Nashville, Tennessee, for a cash consideration of $712,500, plus interest thereon at the rate of 3 per cent per annum from June 30, 1942, to the date of actual transfer of the securities.

■ In its opinion the Commission makes a careful analysis of the sale and finds that it was entered into as a result of arm's-length negotiation between the parties and that the contemplated consideration is a reasonable one. This conclusion was justified on the evidence before the Commission. The opinion states in detail the various factors which led to this conclusion, and we need not rehearse them here. It is sufficient to point out that the consideration was in excess of National's original investment in the concern, bore a reasonable relation to the company's assets, gross and net earnings for several years, and potential future earnings in the light of the nature of the area to be served and possibilities of business, and was the best among various offers National had received. A sale for cash was practically required; it would be at least highly undesirable, even if possible, to attempt to distribute these assets in kind to National's own security holders. An extensive report of Messrs. Duff and Phelps, Chicago engineers employed by Equitable, concluded that a reasonable valuation of the physical property, predicated primarily on original depreciated cost, would be $650,000, with other assets of about $100,000. There was no evidence produced—and none was suggested by petitioner—pointing to the possibility of obtaining a greater sale price, and hence to any actual injury to petitioner's extremely limited interest in the transaction.

■ The only question before us, therefore, is whether, as petitioner so strenuously asserts, he was denied the essentials of a fair hearing. Since he was the moving actor in almost three-quarters of the 3½ days' hearing, the record shows that he certainly was heard; the question is how. He makes his claims of errors now in quite general form, without referring to particular errors in rulings or defining what he was prepared, but not allowed, to prove. We have, however, examined the entire record with care, and think it is manifest that no error which could possibly affect the result occurred.

The difficulty with petitioner's case throughout has been that, while he was quite sure the facts showed constructive fraud in the sale, the Commission could not see it, nor can we. It is true, moreover, as the Commission says, that whatever might be the fiduciary relations of the parties, they affirmatively met any burden required as to the fairness of the transaction and the adequacy of the consideration. But petitioner based his cross-examination of the only witnesses produced, Sawyer, the president of National, and Goodloe, the president of Equitable, on his assertion that the sale was an "insider's transaction" which "reeks of" or is "rotten with" fraud. And he made it clear that this was his entire case, and, indeed, stated that all the evidence he might have was what he could get from cross-examining the witnesses produced by the applicants. Hence his claims all went back to the disclosures made in the original application as to the recapitali-

zation which Equitable, a Tennessee investment banking firm, intended to effect of West Tennessee after the purchase had been consummated.

■■ The contract of sale between National and Equitable was entirely unconditional; the purchaser was obligated to pay the consideration without reference to later events, such as its resale of the securities. Moreover, the evidence showed that negotiations for the sale were completed before Equitable entered upon its later arrangements. Nevertheless, these were completed before the actual signing of the contract with National, and perhaps may be assumed as all a part of the transaction, as petitioner claims. At any rate, Equitable proposed to effect further financing by West Tennessee, including a first mortgage of $485,000 to an insurance company and the issuance of preferred and common stock which would pay off West Tennessee's indebtedness and retire its old stock. As commissions for the sale of these securities, Equitable would receive a gross profit of $35,000 (less the cost of the engineers' report, around $5,000, and attorneys' fees, transfer taxes, and miscellaneous expenses), and would also hold for itself 9,000 shares of common stock worth $11,250 at $1.25 per share. This remuneration to Equitable the Commission held to be not excessive under the circumstances. And the Commission specifically declined to pass upon the validity of the proposed recapitalization of West Tennessee, as it was not here involved, but considered the plan only for what bearing it might have on National's proposed sale.

It is an additional feature of the transaction, however, in which petitioner finds his clear showing of fraud. Of the 100,000 shares of West Tennessee's common stock to be disposed of, Equitable proposed to sell 67,000 at $1.25 per share, or a total of $83,750, to eight individuals in Tennessee, among whom were included officers and directors of West Tennessee, and particularly John Wisdom, its president, who agreed to take 12,000 shares and to pay therefor $15,000. Petitioner's claim of fraud is based on his contention that Wisdom and his associates were fiduciaries. Of course, they were as to West Tennessee; and if West Tennessee were attacking the acts of its officers, there might be point in the claim. But why the fact that they were fiduciaries of West Tennessee should prevent them from buying securities of their company from an investment banker or even direct-

ly from National, or how that can be a fraud on National's security holders, does not appear. Indeed, from National's standpoint, it would seem most natural to dispose of the investment to those most interested; that would be where the best price might well be found. In all petitioner's voluminous claims and assertions we find nothing to support his contention that the purchase here was fraudulent in law. The only two cases he cites on the point, Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546, 62 A.L.R. 1; and S.E.C. v. Chenery Corp., 318 U.S. 80, 85, 63 S.Ct. 454, 458, 87 L.Ed. ——, have no application other than the expression of general broad fiduciary obligations not immediately applicable. Nor does Sawyer's response to persistent questioning by petitioner that he considered Wisdom a good friend of his, just as he considered the other presidents of National's subsidiaries, add anything. There is nothing to prevent a sale to a friend. True, approval should not be given for sale at an inadequate consideration; but, as we have seen, the consideration was adequate.

■■ Nevertheless, acting on this fundamental error of law, petitioner embarked upon what he clearly regards as a crusade. Before the hearing began he asked removal of the trial examiner on the claim that previous matters had shown the latter's bias against him; as the hearing opened he charged dereliction of duty upon the part of the Commission's counsel; and as the examiner restrained his examination of Sawyer and Goodloe, his anger increased until eventually the proceedings lost all decorum. Possibly it would have been wiser if the trial examiner, once having given the petitioner the right to cross-examine, had allowed him some more scope at the beginning to develop the case he wished to present and had not ruled out questions on cross-examination of Sawyer, such as the relationship of the purchasing officials to West Tennessee. Perhaps petitioner's sense of injustice would not now be so strong, though this is not clear. At any rate, all these facts either appeared of record or were fully brought out eventually. So far as we can discover—in the absence of aid from petitioner's briefs—nothing to develop his case was finally kept from the Commission or from us. And it is true that the examiner could have required him at the opening of the hearing to disclose what he intended to show, and by that means would

have been able to see that there was to be nothing forthcoming affecting the validity of the sale. Once that appeared fully, there was no reason for extending petitioner's limited privilege of participation[2] or of continuing the hearing so far as he was concerned. As a matter of fact, it was continued for two days and was later reconvened for another day and a half under petitioner's pressure. We therefore find no prejudice to petitioner's limited interest from these rulings.

Nor do we think petitioner's final exclusion from the hearing unjustified. Indeed, this termination became inevitable. Petitioner's twenty years of legal practice, to which he made so frequent reference, should have taught him that abuse of the tribunal and of his opponents could not supply a legal deficiency in his case. It is perhaps unfortunate that, his emotions being so involved in the issues, he has overlooked the old adage as to the doctor who attempts to attend himself professionally, and has continued to act throughout as his own counsel.

Order affirmed.

---

[2] Petitioner claims to be entitled to full participation as of right; but the Act, while requiring the Commission, in accordance with rules it may prescribe, to admit as a party an interested state commission or other state body, states only that it "may admit as a party" a representative of consumers or security holders or "any other person whose participation in the proceedings may be in the public interest or for the protection of investors or consumers." § 19, 15 U. S.C.A. § 79s. The Commission's Rule 17, supra note 1, therefore, appears properly applicable in this situation.