**FIRST NATIONAL COMPANY,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 14059.

United States Court of Appeals
Sixth Circuit.

April 28, 1961.

William Waller of Waller, Davis & Lansden, Nashville, Tenn., for petitioner.

Victor A. Altman, Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Louise Foster, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before McALLISTER, Chief Judge, and MARTIN and MILLER, Circuit Judges.

SHACKELFORD MILLER, Jr., Circuit Judge.

The Commissioner of Internal Revenue determined an income tax deficiency against the petitioner, First National Company, for the taxable years 1951, 1952 and 1953 in the respective amounts of $42,381.19, $5,742.79 and $6,597.97. The deficiency was based upon the disallowance by the Commissioner of deductions taken by the petitioner as interest paid by it during the years in question on its outstanding promissory note in the principal amount of $1,838,299.10, the Commissioner holding that the note did not represent any genuine and then existing indebtedness owing by the petitioner.

The facts are stipulated and are set out in detail in First National Company v. Commissioner of Internal Revenue, 32 T.C. 798, to which reference is made. The following summary is sufficient to present the issue now before the Court.

The petitioner was originally organized as a bank and trust company in 1926, but on June 7, 1944, its corporate purposes and powers were changed to that of a mercantile establishment. Except for being involved in certain litigation the petitioner was not engaged in any active business from late in 1931 to early in 1943.

During the years 1930 and 1931 the petitioner issued promissory notes totaling $2,613,250 to several banking companies, representing borrowed money. For convenience, transactions relative to these notes are divided into two groups.

### Loans by the Fourth and First Banks, Inc.

During 1930 and 1931 three demand promissory notes, totaling $688,899, were given by the petitioner to its parent company, the Fourth and First Banks, Inc., hereinafter called Fourth Banks. In 1931 the latter also made advances in the amount of $74,547.16, which were not covered by notes until 1943 and were not entered on the petitioner's books until 1937. By 1940 the total owed by the petitioner on these loans amounted to $761,140.66. No interest was paid on these loans after February 19, 1932. Prior to December 31, 1950, petitioner's indebtedness had been charged off on the books of Fourth Banks down to a value of only $2.

Prior to December 1942 all of the petitioner's outstanding capital stock, consisting of 1,000 shares of common stock with a par value of $100 per share, was owned by Fourth Banks and had been given a value on its books, sometime prior to December 31, 1940, of only $1.

### Other Loans to the Petitioner.

During 1930 and 1931 petitioner borrowed $1,724,351 from, and gave promissory notes totaling that amount to, the National City Bank, the Philadelphia National Bank, the American National Bank, and the Nashville Trust Company, hereinafter referred to as "Other Banks." With minor exceptions the only payments on these notes were made with money received from the sales of collateral held by the banks as security for the notes.

By December 1942 the unpaid balance on these notes to the Other Banks amounted to $1,127,900.11. With one exception no interest on these notes was paid after February 19, 1932, the one exception being an interest payment of $125,255.32 through a sale of collateral held by one of the banks. The notes were largely charged off as worthless by the several banks.

Shortly prior to December 11, 1942, Parkes Armistead, Paul M. Davis and G. L. Comer undertook to acquire the notes, indebtedness and stock held by the Fourth Banks and the notes held by the Other Banks. Armistead was, and had been since February 1937, a member of the petitioner's Board of Directors and continued to be a Director until June 22, 1943. He was petitioner's president from December 15, 1942, until July 15, 1943. He was also executive vice-president of the American National Bank, one of the banks holding the notes. Davis was in mid-December 1942 the president of the American National Bank and at that time was made a member of the petitioner's Board of Directors. He was also a vice-president from December 15, 1942, to July 15, 1943. Comer was elected a member of the petitioner's Board of Directors on June 22, 1943, and has remained a director since then. He was also elected one of the three vice-presidents of the petitioner on July 15, 1943, and has continued as such since then.

On December 11, 1942, Armistead, Davis and Comer acquired all of petitioner's capital stock from Fourth Banks, together with petitioner's notes payable and accounts payable to the Fourth Banks in the amount of $761,140.66. The consideration given was $1,000. New stock certificates were issued to them and their nominees.

At or about the same time Armistead also acquired from the Other Banks the notes of petitioner which they held for a payment by him of 4½% of the unpaid balance of each note, which payment, totaling $50,741.67, was made by his personal checks or cashier checks purchased for that purpose. The value of petitioner's total assets at that time was $51,531.20. The assets were immediately converted into cash and the $50,741.67 that Armistead had paid out in obtaining the notes from the Other Banks was repaid to him almost simultaneously by

the petitioner. The excess cash derived from the liquidation of the petitioner's assets was expended in its entirety in defraying the costs of liquidation and in the purchase of transfer stamps for the transfer of its stock on its books to Armistead, Davis and Comer.

On July 1, 1943, petitioner issued its unsecured, demand promissory note to Davis, Armistead, and Comer in the amount of $74,547.16, which was in lieu of the account payable in a like amount carried on petitioner's books as being due Fourth Banks. Petitioner's minute books contained no authorization for issuance of this note.

On or about January 12, 1945, Comer purchased the respective interests of Armistead and Davis in petitioner for $30,000 to each of them. A new certificate for 1,000 shares of common stock was issued to Comer by petitioner on January 12, 1945, making him the sole owner of petitioner's outstanding voting common stock, with a total investment therein of $60,333.

On May 31, 1946, Comer for the sum of $60,333 transferred the 1,000 shares of stock to Washington Manufacturing Company, which on October 26, 1946, transferred it to the Washington Overall Manufacturing Company. Both of these companies were controlled by Comer and his brother.

On or about July 23, 1951, all of the old notes payable of petitioner were given by Comer to the Church of Christ Foundation, Inc., hereinafter referred to as the Foundation. The Foundation was incorporated under the laws of Tennessee August 28, 1946. It had five incorporators, two of whom were Comer and his brother. Comer was elected vice-president and a member of the Board of Trustees on December 20, 1946. His brother was elected president and a member of the Board of Trustees on December 20, 1946, and served in such capacities until his death on June 26, 1953. The Foundation was ruled a tax exempt organization by the Internal Revenue Service on January 5, 1948.

The old notes as given to the Foundation by Comer had outstanding balances thereon of $1,838,299.10. On August 1, 1951, petitioner issued its unsecured, demand promissory note to the Foundation in that amount. This action was authorized by the "entire outstanding voting stock" and Board of Directors of petitioner on July 23, 1951. The Foundation surrendered to the petitioner all the old notes at that time. On December 27, 1951, the Washington Overall Manufacturing Company transferred the 1,000 shares of the outstanding common voting stock of the petitioner to the Foundation.

By November 24, 1954, petitioner had paid the principal amount due on its single note to the Foundation. In addition to the payments of principal, petitioner paid to the Foundation in the years 1951, 1952 and 1953 certain sums as interest on the note which it took as interest deductions in its income tax returns for those years. These are the deductions which the Commissioner disallowed, resulting in the deficiency assessment herein involved.

The petitioner contended, and now contends, that the promissory note was an outstanding valid indebtedness on its part, and that the interest payments paid by it on the note were properly deductible under Section 23(b), Internal Revenue Code, 26 U.S.C.A. § 23(b). That section provides that in computing net income there shall be allowed as deductions "all interest paid or accrued within the taxable year on indebtedness," with certain exceptions not applicable here. The Commissioner contended, and the Tax Court held, that the payments made by the petitioner were not allowable as interest deductions because the liability under the note to the Foundation was not a bona fide liability of the corporation, and that the amounts claimed as interest were to be treated as contributions subject to the statutory limitations.

In support of his position the Commissioner argues that in order to be deductible "interest" must be paid on "indebtedness," which as used in Section

23(b) means an existing, unconditional and legally enforceable obligation for the payment of money. Autenreith v. Commissioner of Internal Revenue, 3 Cir., 115 F.2d 856; United States v. Virgin, 5 Cir., 230 F.2d 880. We agree with this statement of the applicable law.

The Commissioner and the Tax Court are not entirely in accord in their reasons for the conclusion that the note was not such a valid indebtedness, but if the conclusion is correct upon any legal ground, it should be affirmed. Riley Inv. Co. v. Commissioner of Internal Revenue, 311 U.S. 55, 59, 61 S.Ct. 95, 85 L.Ed. 36; Helvering v. Gowran, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224.

The Tax Court did not rely upon the fact that the Tennessee six-year statute of limitations had run against the notes at the time they were transferred by Comer to the Foundation. Tisdale v. Munroe, 11 Tenn. 320. Nor does the Commissioner's brief on this review appear to contend that the mere running of the statute extinguished liability beyond the point of revival. But it appears that Commissioner's counsel relied to some extent upon this fact in his statement of the case to the Court. We, accordingly, give it consideration.

 It does not follow that because the statute of limitations has run against an outstanding note, the obligation is extinguished and is no longer a valid, legal obligation of the maker. It is settled law in Tennessee that the statute of limitations bars the remedy but does not extinguish the debt; that the statute of limitations may be waived, and unless it is specially pleaded in an action on the indebtedness, it is waived. Hannah and McCord v. Hawkins, 73 Tenn. 240, 243; Bruce v. Baxter, 75 Tenn. 477, 479. Petitioner, by its execution of the consolidated note, waived the statute of limitations with respect to its indebtedness. There was nothing improper or illegal in its waiver of the statute of limitations. Such action is usually commended, instead of condemned. The new note is supported by consideration, namely, bor-

rowed money by the petitioner and the surrender of the old notes. It was not a fictitious or sham transaction. Both the principal of the note and the interest thereon were actually paid thereafter to the holder of the note. The fact that the transaction may have resulted in later tax advantages does not affect its validity or permit it to be ignored. Chamberlin v. Commissioner of Internal Revenue, 6 Cir., 207 F.2d 462, certiorari denied, 347 U.S. 918, 74 S.Ct. 516, 98 L.Ed. 1073. We are, accordingly, of the opinion that the running of the statute of limitations did not extinguish the indebtedness represented by the old notes or prevent the new note from being a genuine existing indebtedness.

 It is true, however, that if at the time Comer transferred the old notes to the Foundation, they did not constitute a valid legal indebtedness of petitioner by reason of other factors, the transfer to the Foundation and the execution of the consolidated note to the Foundation did not convert them into a legal obligation. Comer could not transfer by gift any greater claim than he legally had. The execution of the new note would not have been supported by consideration. Accordingly, the real question presented is whether, on account of other reasons relied upon by the Commissioner and the Tax Court, the notes in the hands of Comer were valid obligations of the petitioner at the time of their transfer to the Foundation.

 The Commissioner contends that under all of the facts in the case it is proper to conclude that Armistead, in arranging and carrying through the transactions, was acting for the petitioner, rather than for himself and his two associates, Davis and Comer, and that it was intended by the parties that the transactions would operate as a final settlement of all the indebtedness of the taxpayer. It is not so stipulated. No evidence to that effect was offered outside of the stipulated facts, and such a conclusion appears to us to be directly contrary to the following admitted facts.

Exhibit 17 to the stipulation is an executed written agreement of December 7, 1942, between Armistead, Davis and Comer, which stated that it was understood and agreed that Armistead was representing himself, Davis and Comer in purchasing the capital stock, notes and indebtedness of the petitioner in the transactions herein referred to and "that the purchase price of all of the above notes and securities will be paid for by each one of us paying one-third of the purchase price and receiving in return one-third of the stock, *notes and other indebtedness purchased.*" (Emphasis added.) The stipulation states that on December 11, 1942, Armistead, Davis and Comer "acquired the total outstanding capital stock of petitioner * * * together with notes payable and accounts payable of petitioner to the Fourth Banks."

The notes held by all the banks were turned over to Armistead, and were never surrendered by him to petitioner.

On July 1, 1943, petitioner issued its unsecured, demand promissory note to Davis, Armistead and Comer in the amount of $74,547.16, which represented the account payable that petitioner had carried on its books as being due Fourth Banks. If petitioner's indebtedness had been settled in December 1942 when the transactions were completed by Armistead, this note would not have been issued.

None of the notes received by Armistead were destroyed, or marked paid or cancelled, but on the contrary, were held by Armistead, Davis and Comer until they were later transferred to Comer about January 12, 1945, clearly indicating that Armistead, Davis and Comer considered themselves, rather than the petitioner, as the purchasers and owners of the notes.

Apparently, this view of the transactions was at all times acquiesced in by the petitioner, as the record does not show any request or demand by the petitioner that the notes be surrendered or physically cancelled. On the contrary, petitioner recognized the notes as its outstanding obligations when it executed its renewal note to replace them.

We are of the opinion that this contention of the Commissioner cannot be sustained.

■■ Nor do we agree with what is considered by us as an equitable suggestion in respondent's brief, that since no effort was made by the holder of the notes over a long period of years to collect either interest or principal, it is fair to assume that the holder considered them as worthless and released the petitioner of any further liability thereunder. In the absence of affirmative action by the holder to that effect, we do not believe that such is the rule. A valid note does not become invalid because its maker becomes insolvent and the note is no longer of any value. Nor does the added fact that the holder recognizes and concedes such lack of value by his failure to take action, authorize a Court to hold that the obligation was released and cancelled.

With respect to the indebtedness of the Other Banks, the Tax Court pointed out that Armistead was a director of petitioner and also became its president at approximately the time he began the final execution of his plan, and that in each of these capacities his duty to the petitioner was to conduct its affairs in such a manner that neither he nor another could unduly profit from its desperately insolvent condition. Consequently, he was not in a position to employ what substantially in effect was the funds of the petitioner to acquire as his own the notes owing by petitioner to the Other Banks and thereby become a creditor of the petitioner to the extent of the unpaid portion of the notes which was in excess of one million dollars. Under these circumstances, the Tax Court reasoned, physical surrender of the notes to Armistead constituted physical surrender to the petitioner, and since a favorable settlement of the note indebtedness had been obtained, it followed that the petitioner's indebtedness on the notes had been ex-

tinguished before they were given to the Foundation. The execution of the renewal note was accordingly without consideration and unenforceable.

██ We recognize the well established rule that a director of a corporation occupies a fiduciary relationship to the corporation. In re Van Sweringen Company, 6 Cir., 119 F.2d 231; Seagrave Corp. v. Mount, 6 Cir., 212 F.2d 389, 396. But other questions must also be considered. To whom does the fiduciary duty run, and what rights are acquired by whom if the duty is violated? Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 85–86, 63 S.Ct. 454, 87 L.Ed. 626.

██ We are of the opinion that a breach of a fiduciary duty creates a right of action on the part of the person to whom the duty is owed and that such person is the only one who has the right to attack the transaction if he desires to do so. Consent to the transaction or ratification of it later waives the right to set aside the transaction. City of Findlay v. Pertz, 6 Cir., 66 F. 427, 437, 29 L.R.A. 188, 6 Cir., 74 F. 681; Okin v. Securities & Exchange Commission, 2 Cir., 137 F.2d 398, 401; United States Rolling Stock Co. v. Atlantic & Great Western Railroad Co., 34 Ohio St. 450, 461–462; Bell v. McConnell, 37 Ohio St. 396; Restatement, Agency 2nd, 388, 390.

██ In the present case all of the stock of petitioner was acquired by Armistead, Davis and Comer as part of the transaction through which the notes were acquired. There have been no objecting stockholders and the corporation itself has ratified the transaction by its execution of the renewal note. The Commissioner has no standing to challenge the validity of the transaction.

██ With respect to the indebtedness of petitioner to the Fourth Banks, the Tax Court had a different view. It held that since the record afforded no basis for allocating the consideration of $1,000 between the stock and the notes and the account payable, it was "fair to conclude" under the stipulated facts that $1,000 was paid for the stock and that nothing whatever was paid for the notes and account payable, and that Fourth Banks in making physical delivery of the notes to Armistead and transferring its claim, surrendered and released to petitioner the indebtedness owing to it by petitioner which was represented by such notes and claim. Assuming, without so holding, that Armistead, Davis and Comer paid nothing for the notes and account payable, the fact that they were donees does not mean that they did not acquire ownership of the notes and claim and the right to enforce them against the debtor to the same extent that they were enforceable in the hands of the Fourth Banks. No claim is being made that Armistead, Davis and Comer are holders in due course and thereby able to cut off defenses between the original parties.

We are of the opinion that the renewal note held by the Foundation was a valid, existing indebtedness of the petitioner and that interest payments upon it during the years 1951, 1952 and 1953 should have been allowed by the Commissioner as proper income tax deductions.

The decision of the Tax Court is reversed and the case remanded to the Tax Court for further proceedings consistent with the views expressed herein.