**E. R. WAGNER MANUFACTURING COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 63–C–73.

United States District Court
E. D. Wisconsin.

Dec. 8, 1964.

William J. Willis, Milwaukee, Wis., for plaintiff; Foley, Sammond & Lardner, Milwaukee, Wis., of counsel.

Louis F. Oberdorfer, Asst. Atty. Gen., C. Moxley Featherston, John B. Jones, Jr., Rupert J. Groh, Jr., Attorneys, Department of Justice, Washington, D. C., James B. Brennan, U. S. Atty., by Franklyn M. Gimbel, Asst. U. S. Atty., Milwaukee, Wis., for defendant.

GRUBB, District Judge.

Plaintiff, E. R. Wagner Manufacturing Company, a Wisconsin corporation, hereinafter called the "Taxpayer," seeks to recover income taxes paid for the year 1959, pursuant to deficiencies assessed in respect to deductions disallowed by the Internal Revenue Service. The action was tried to the court. There is no issue as to jurisdiction or venue. The parties have stipulated to substantial portions of the record.

Two questions are presented in this case:

1. Whether payments to stockholders of Taxpayer, made pursuant to certain stock repurchase agreements, constitute payments of interest and are deductible as such for federal income tax purposes under Section 163, Title 26 U.S.C., I.R.C. 1954; and

2. Whether a payment to the widow of a deceased employee of Taxpayer constitutes an ordinary and necessary business expense under Section 162(a), Title 26 U.S.C., I.R.C.1954.

## 1. PAYMENTS UNDER STOCK REPURCHASE AGREEMENTS

The Taxpayer is a closely-held corporation. The Wagner family owns the majority of the outstanding common stock. Prior to 1959, the Taxpayer had initiated a program by which selected employees of Taxpayer were permitted to purchase its common stock. As a condition of the purchase, the employees were required to execute stock repurchase agreements.

The repurchase agreements provide, in substance, that in the event of the employee's death or other termination of employment, the employee, or his legal representative, must offer Taxpayer the option to repurchase the stock. Taxpayer has sixty days in which to act. If Taxpayer does not exercise the option,

the stock automatically becomes subject to the agreement again after ninety days. The Taxpayer may acquire the stock of nonemployee transferees at any time. The employee must also offer the stock to Taxpayer before transferring it to a third party. The price per share to be paid on repurchase is fixed annually at the meeting of the shareholders. The effective date of this valuation relates back to the first day of January of the year of the meeting. The shareholder receives the purchase price of the stock less any dividends paid between January 1st of the year of repurchase and the date of actual repurchase. The agreements provide that the shareholder will receive "interest" of 6% on the amount of the purchase price from the first day of January of the year of repurchase to the date of actual repurchase.

The Taxpayer may make the payment in the form of cash; a promissory note due in five years and bearing interest at 6%; preferred stock, second issue, without accrued dividends, redeemable at the option of the Board of Directors; or any combination of these forms of payment.

At the annual meeting held February 20, 1959, the repurchase price was fixed at $246.32, to be effective as of January 1, 1959. A dividend of $5.00 per share was paid on the common stock on December 30, 1959. Three employees who were shareholders at the beginning of 1959 and who had previously executed repurchase agreements died or otherwise terminated their employment.

Carl F. Garny died on August 9, 1959. At the time of his death he owned 1,000 shares of the Taxpayer's common stock. His executor made the repurchase offer on September 9, 1959, and the Taxpayer exercised the option on November 27, 1959. Payment was made on December 30, 1959, in the form of 2,460 shares of 6% preferred stock (having a value of $100 per share) and $320 cash, which equalled the total value of Mr. Garny's common stock, or $246,320, based upon the valuation adopted by the shareholders at the annual meeting. The 6% "interest" payment, called for in the repur-

chase agreement, was paid in cash in two installments—$13,547.65 on December 1, 1959, and $1,231.55 on December 31, 1959. In effect, the total amount of "interest" paid, or $14,779.20, constituted payment of said "interest" for the full year of 1959. Mr. Garny's estate received neither the $5.00 dividend on the common stock nor the 3% semi-annual preferred stock dividend paid in December 1959.

A. F. Wagner died on April 24, 1959. At the time of his death, he owned 150 shares of common stock. On August 24, 1959, his executor made a written offer to repurchase. Taxpayer exercised its option to reacquire the shares on September 1, 1959, and made payment on that date by issuance of 170 shares of preferred stock, a cash payment of $3,948, and a 5-year note for $16,000. Additionally, there was a payment of $1,478 as "interest" on the repurchase price, computed from January 1, 1959, to date of payment.

C. B. Woest, who owned 50 shares of common stock, terminated his employment with Taxpayer on March 31, 1959, and made the offer to repurchase on that date. The Taxpayer exercised its option to reacquire the common stock on June 1, 1959, and effected the repurchase on that date by issuance of 110 shares of preferred stock and a cash payment in the amount of $1,316. Additionally, Taxpayer paid Mr. Woest $307.90 as "interest," computed for the period from January 1 to June 1, 1959.

Taxpayer contends that payments made pursuant to the "interest" provision of the repurchase agreements constitute interest for federal income tax purposes in that the agreements used language and provided for a rate appropriate to payment of interest, and in that the substance of the transactions, pursuant to the repurchase agreements, evidenced the existence of an indebtedness and compensation for the use of money. It is claimed that a legal indebtedness came into being when the Taxpayer exercised its repurchase option. Further, an indebtedness existed

at the time of the termination of the employment of a shareholder because of the Taxpayer's policy of selling stock to employees as an incentive measure and reacquisition of stock on termination of employment.

In fact, it is contended that the deceased or retired employee's investment for the entire year of termination was in the nature of debt rather than equity by virtue of the terms of the repurchase agreements which provided for a fixed value of the common stock, effective as of the beginning of the year of termination of employment, and for a fixed rate of return for that year in lieu of a dividend.

Taxpayer further submits that where it is found that an indebtedness exists in fact, interest may commence to run prior to the establishment of the indebtedness.

The words "interest * * * on indebtedness" as used in the statute, providing for federal income tax deduction thereof, have the meaning of "compensation for the use or forbearance of money." Deputy, Administratrix v. Du Pont, 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940). The indebtedness giving rise to the compensatory payment of interest must be an existing, unconditional, and legally enforceable obligation for the payment of money. Autenreith v. Commissioner of Internal Revenue, 115 F.2d 856, 858 (3rd Cir. 1940); First National Company v. Commissioner of Internal Revenue, 289 F.2d 861 (6th Cir. 1961).

The transactions of reacquisition of Taxpayer's common stock, pursuant to repurchase agreements, do not present the necessary condition of an existing, unconditional, and legally enforceable obligation for the payment of money, commencing on January 1, 1959, and running to the date of actual payments.

On the day of exercise of the option to repurchase, the Taxpayer incurred an obligation to reacquire the stock in exchange for payment of cash, note, or preferred stock. In two instances, Taxpayer discharged that obligation simul-taneously with its incurrence by issuance of shares of preferred stock, cash, and execution of a note on the date of exercise of the options to repurchase the stock of C. B. Woest and A. F. Wagner. No use or forbearance of the use of money resulted in these cases.

In the case of Carl F. Garny, Taxpayer exercised the option on November 27, 1959, and postponed payment in the form of preferred stock and a small cash payment until December 30, 1959. In effect, Taxpayer exchanged one equity interest, preferred stock, for another equity interest formerly held by the employee; that is, common stock with voting rights, pursuant to resolution of its Board of Directors passed prior to exercise of the option. Exchange of one equity interest for another does not constitute the use or forbearance of the use of money to be compensated by payment of interest during the period of time from the exercise of the option to the date of payment or exchange.

The circumstances of the stock repurchases in this case may be distinguished from the purchase and sale of stock involved in Journal Co. v. Commissioner of Internal Revenue, 125 F.2d 349 (7th Cir. 1942), where it was held that compensation for the use of money arising out of a contingent obligation to purchase stock constituted deductible interest. In the Journal case, the obligations of the taxpayer and the purchaser were fixed and legally enforceable by each party, the purchase price was in terms of money, and the only contingency was the approval of the sale by a court—an event beyond the control of either party. The interest payment by the purchaser was considered compensation for the use of money and as a provision against loss by delay pending court approval of the sale.

For purposes of determining the nature of the disputed payments, the actual transactions of reacquisition cannot be considered without resort to the provisions of the repurchase agreements which set forth the obligation of the parties. In the instant case, the Taxpayer was under no obligation to reac-

quire the common stock until exercise of the option. Under the terms of the repurchase agreements, it could delay reacquisition beyond the year of termination and could avail itself of a stock value for purposes of compensation other than that of the year of termination. It was also free to determine whether payment would be in the form of cash, debt in the form of an interest-bearing note, or equity in Taxpayer by preferred stock issuance.

No indebtedness—that is, an existing, unconditional, and legally enforceable obligation for the payment of money— arose on January 1, 1959, nor did such an obligation arise on termination of the employment of the shareholders. Taxpayer's past practice of reacquiring the common stock does not alter the fact that under the repurchase agreements, it was under no obligation to do so, either in the year of termination or at any time. For this reason, Taxpayer's contention that the employee's common stock was converted into a debt rather than equity investment in Taxpayer cannot be sustained. Assuming, arguendo, that loss of dividends and the fixing of the value of the stock would convert common stock into a debt holding, the claimed conversion was at the discretion of the Taxpayer and did not confer legally enforceable rights upon the shareholder prior to exercise of the option.

Taxpayer's total repurchase transactions in the year 1959 showed an existing unconditional obligation to pay a sum of money, in the accepted meaning of this term, in the amount of $320—the cash payment to Mr. Garny's estate—for a period of one month and a few days. Allowance of interest in the total amount of $16,565.10 in respect to this underlying indebtedness on the basis of permitting interest to run prior to commencement of the debt would extend the meaning of the word "interest" beyond its accepted business and tax purpose connotation. Cf. Commissioner of Internal Revenue v. Philadelphia Transp. Co., 174 F.2d 255 (3rd Cir. 1949), aff'd per curiam 338 U.S. 883, 70 S.Ct. 186,

94 L.Ed. 542, where no issue was raised as to the existence of the indebtedness.

The government contends, with some plausibility, that the disputed payments are dividends or are in the nature of a price adjustment to compensate the shareholders for the loss of dividends and loss of increase in value from the effective date to date of purchase. While the rate of 6% does not exactly correspond to dividends and increase in value, it does serve to alleviate the losses. For purposes of this case, it is necessary to determine whether or not the payments in issue constitute deductible interest. Where it is determined that they do not fall within the interest category, the true nature of the payments is not material.

The Taxpayer has failed to meet its burden of showing that the claimed deduction clearly falls within the deduction provision of the taxing statute. New Colonial Ice Co., Inc. v. Helvering, Commissioner of Internal Revenue, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348 (1934). The use of language and rate appropriate to payments of interest does not serve to create an indebtedness where none existed in fact. The deduction for interest must be disallowed.

2. PAYMENTS TO WIDOW OF DECEASED EMPLOYEE

On or about December 15, 1959, Taxpayer made a payment of $15,000 to the widow of Carl F. Garny who had died on August 9th of that year. The payment was made pursuant to the following authorization of Taxpayer's Board of Directors, adopted at a meeting on October 15, 1959:

> "The matter of the payment of a gratuity to the widow of C. F. Garny in consideration of his great contribution to the Company was considered. Thereupon, upon motion duly made and seconded, it was unanimously

> "RESOLVED, that as an expression of sympathy and kindness to the widow of C. F. Garny, there shall be paid to Mrs. Garny the sum of

"$15,000, said payment to be made on or before December 31, 1959."

At the time of his death, Mr. Garny was a director and secretary of Taxpayer, performing executive functions, and had been in its employ for over fifty years. He was survived by his wife, Mrs. Hilda Garny, who was in extremely ill health, and by his son, Carl R. Garny, who was then an employee of Taxpayer.

Mr. Garny shared in the profit-sharing retirement plan of Taxpayer and participated in its employee group life insurance program. On his death, his widow received $15,867.56 and $14,000, respectively, under these programs.

Compensation of Taxpayer's executives was divided into a base salary and a year-end adjustment. During the years 1957 and 1958, Mr. Garny received an annual base salary of $24,000 and year-end adjustments of $19,000 and $14,000, respectively. In 1959, Taxpayer was reducing Mr. Garny's compensation by at least $9,000 and was contemplating further reduction for the following year.

Taxpayer described the payment to Mrs. Garny as a gratuity on its 1959 income tax return, executed and signed under oath by Robert S. Wagner, its president. The payment was carried in the Taxpayer's books of account and annual report as a gratuity. Taxpayer did not withhold tax from the payment and did not file W–2 or 1099 forms with respect thereto.

Taxpayer contends that the payment to Mrs. Garny was made as part of its over-all compensation program and therefore qualifies as an ordinary and necessary business expense, deductible for federal income tax purposes. Robert S. Wagner, Taxpayer's president and controlling shareholder, testified to the existence of a "plan, formulated in 1957, applicable to three employees who because of age were not eligible for a split-dollar insurance program Taxpayer was initiating and a "plan" for deferred compensation it was then considering.

Mr. Wagner testified that he discussed the "plan" with the employees whom it concerned—Carl F. Garny, J. A. Kurz, and E. H. Jones. Mr. Wagner considered the "plan" to create a moral obligation to pay these employees two years' base salary upon retirement or upon their death if they died after reaching the retirement age of 65, leaving a wife or children surviving. The amount of deferred compensation could be paid over ten years to the employee, or to his surviving wife or children. In the event an employee retired or died before retiring between his 68th and 70th birthdays, the compensation plan called for payment of 180% of the employee's base salary rather than 200%.

Mr. Garny was 68 years old when he died, and he would have been eligible under the "plan" for 180% of his base salary, or an aggregate of $43,000. The $15,000 payment in issue here is claimed to have constituted the first installment.

■ Taxpayer has the burden of establishing that the payment was an ordinary and necessary business expense incurred by it. Interstate Drop Forge Co. v. Commissioner of Internal Revenue, 326 F.2d 743 (7th Cir. 1964). The government does not raise an issue as to the ordinariness of the payment.

■ The criterion of necessity requires that the claimed corporate expenditure, though ordinary, also was intended "to result in the inurement of a business benefit." Interstate Drop Forge Co. v. Commissioner of Internal Revenue, supra, at 747.

■ The mere fact that the payment to Mrs. Garny was made pursuant to a "plan" formulated by Taxpayer's president, who believed that it created a moral obligation to make the payment, does not serve to establish conclusively the requisite corporate motive.

■ All open, official records concerning the payment to Mrs. Garny, such as the corporate resolution, tax returns, and books of account, designated the payment as a gratuity. This term is consistent with a donative rather than a compensatory motive—an intention to bestow a benefit or favor on the recipient. The

term does not indicate that the payment was intended as compensation for past services. Further, there was no showing that Mr. Garny's compensation had not been adequate during his lifetime.

The corporate treatment of the payment did not apprise Taxpayer's other employees of the fact that the payment was made pursuant to a moral obligation under a "plan" of deferred compensation. Initially, the existence of the "plan" was disclosed only to the persons immediately affected thereby. On Mr. Garny's death, Taxpayer's president mentioned its existence to the son of the deceased. At the time of the payment to Mrs. Garny, Taxpayer did not openly and directly inform the other two employees who were affected by this plan, or any of its other employees, that the payment was made pursuant to a "plan." Under these circumstances the payment could not have served the business objective of furtherance of employee incentive or morale building.

Subsequent payments to Mrs. Garny or to the other two employees, purportedly pursuant to the "plan" formulated by Taxpayer's president, do not establish the corporate motive in making the payment in issue. This intent must be discerned from all the objective circumstances surrounding the payment. Evidence of the private intention of Taxpayer's president, who was only one member of its Board of Directors and who retained all documents relating to the "plan" of deferred compensation in his private files, which private intent is inconsistent with substantially all other overt corporate action in respect to the payment, fails to satisfy the required burden of proof of establishing a business purpose and expectation of economic benefit by Taxpayer. Cf. Tomlinson v. Hine, 329 F.2d 462 (5th Cir. 1964), and Fritzel v. United States, 339 F.2d 995 (7th Cir., decided November 25, 1964), where the donative intent claimed by taxpayers was controverted by circumstantial and testimonial evidence of business motive.

Under the facts of the instant case, the deduction for the payment to Mrs.

Garny as an ordinary and necessary business expense must be disallowed.

The court adopts the parties' stipulation of facts as its findings of fact. Other findings of fact and conclusions of law are as stated in the foregoing opinion.

The clerk is hereby directed to enter an order for judgment for the defendant, dismissing the complaint with prejudice.