125 T.C. No. 6


UNITED STATES TAX COURT



HUBERT ENTERPRISES, INC. AND SUBSIDIARIES, ET AL.,[1] Petitioners
v. COMMISSIONER OF INTERNAL REVENUE, Respondent



Docket Nos.  4366-03, 10669-03,  Filed September 21, 2005.
            16798-03.



     A few individuals controlled a corporation (P1)
and a limited liability company (ALSL).  P1 transferred
$2,440,684.38 to ALSL primarily to retransfer to a
related limited partnership for use in the construction
of a retirement community.  The construction project
was discontinued, and $2,397,266.32 of the transferred
funds has not been repaid.  P1 seeks to deduct those
unrecovered funds as either a bad debt or a loss of
capital/equity invested in ALSL.  P2 had a subsidiary
(S) that was a member of a limited liability company
(L) that was involved in equipment leasing activities
most of which arose in different years.  Ps claim that
the activities are aggregated under sec.
465(c)(2)(B)(i), I.R.C., into a single activity for the

     [1] Cases of the following petitioners are consolidated
herewith:  Hubert Enterprises, Inc. and Subs., docket No.
10669-03; and Hubert Holding Co., docket No. 16798-03.

purpose of applying the at-risk rules of sec. 465, I.R.C. Ps also claim that S was at risk for portions of L's losses by virtue of a deficit account restoration provision that, Ps state, made S liable for portions of L's recourse obligations.

Held: P1 may not deduct the unrecovered funds as either a bad debt or a loss of equity.

Held, further, S may not aggregate all of L's equipment leasing activities in that sec. 465(c)(2)(B)(i), I.R.C., treats as a single activity only those activities for which the equipment is placed in service in the same taxable year.

Held, further, S may not increase its at-risk amounts on account of the deficit capital account restoration provision in that the provision was not operative in the relevant years.

William F. Russo and R. Daniel Fales, for petitioners.[2]

Gary R. Shuler, Jr., for respondent.

LARO, Judge: The Court has consolidated these cases for trial, briefing, and opinion. In docket Nos. 4366-03 and 10669-03, Hubert Enterprises, Inc. (HEI), and Subsidiaries petitioned the Court to redetermine respondent's determination of Federal income tax deficiencies of $974,805, $734,093, and $1,542,820 in its taxable years ended July 27, 1997, August 3, 1998, and July 31, 1999, respectively (HEI's 1997, 1998, and 1999

---

[2] The petitions in these cases were filed with the Court by James H. Stethem (Stethem), Mark A. Denney (Denney), and R. Daniel Fales. Stethem later died and was withdrawn from the cases on Dec. 1, 2003. Denney withdrew from the cases on Feb. 2, 2005. William F. Russo entered his appearance in docket Nos. 4366-03 and 10669-03 on Feb. 11, 2004, and in docket No. 16798-03 on Mar. 15, 2004.

taxable years, respectively). Respondent reflected these determinations in notices of deficiency issued on December 17, 2002, and April 9, 2003, to HEI and its subsidiaries. Hubert Holding Co. (HHC), HEI's successor as parent of its affiliated group, petitioned the Court in docket No. 16798-03 to redetermine respondent's determination of Federal income tax deficiencies of $1,437,240 and $1,093,008 in its taxable years ended July 29, 2000, and July 28, 2001, respectively (HHC's 2000 and 2001 taxable years, respectively). Respondent reflected this determination in a notice of deficiency issued to HHC on June 30, 2003.

Following concessions by petitioners, we must decide the following issues:

1. For HEI's 1997 taxable year, whether HEI may deduct as either a bad debt or as a loss of capital (equity) $2,397,266.32 of unrecovered funds that it transferred to Arbor Lake of Sarasota Limited Liability Co. (ALSL), a limited liability company of which HEI was not an owner but which was owned primarily and controlled by a few individuals who also controlled HEI. We hold HEI may not deduct the funds as either a bad debt or a loss of capital; and

2. for HHC's 2000 and 2001 taxable years, whether HHC may deduct passthrough losses from leasing activities relating to equipment placed in service in different taxable years. As an

issue of first impression, petitioners claim that section 465(c)(2)(B)(i) aggregates these activities into a single activity for purposes of applying the at-risk rules of section 465.[3]  Petitioners also claim that the members of the passthrough entity, a limited liability company named Leasing Co., LLC (LCL), were at risk for LCL's losses by virtue of a deficit account restoration provision that, petitioners state, made LCL's members liable for portions of LCL's recourse obligations.  We hold that HHC may not deduct equipment leasing activity losses greater than those allowed by respondent in the notice of deficiency.

## FINDINGS OF FACT

Some facts were stipulated.  We incorporate herein by this reference the parties' stipulation of facts and the exhibits submitted therewith.  We find the stipulated facts accordingly.

### I.  HEI

HEI was organized by the Hubert Family Trust (HFT) on or about October 8, 1992.  HEI's only shareholder has always been HFT.  When HEI's petitions were filed with the Court, its mailing address was in Cincinnati, Ohio.

For HEI's 1997, 1998, and 1999 taxable years, HEI was the parent corporation of an affiliated group of corporations that filed consolidated Federal corporate income tax returns.  For

---

[3] Unless otherwise noted, section references are to the applicable versions of the Internal Revenue Code, and Rule references are to the Tax Court Rules of Practice and Procedure.

HEI's 1997 and 1998 taxable years, the group's other members, each of which was wholly owned by HEI, were (1) Printgraphics, Inc. (Printgraphics), (2) HBW, Inc. (HBW) (also known as Weber Co.), (3) BES Manufacturing, d.b.a. Mr. Spray, (4) Vogt Warehouse, Inc. (Vogt), (5) HGT, Inc. (HGT), (6) Hubert Co., and (7) Graphic Forms and Labels, Inc. (Graphic).  For HEI's 1999 taxable year, the affiliated group of corporations in addition to HEI consisted of the just-stated seven wholly owned subsidiaries and two other wholly owned subsidiaries; namely, Public Space Plus, Inc., and Hubert Development, Co.

From HEI's organization through at least 1998, Howard Thomas (Thomas) was HEI's president, Edward Hubert was chairman of HEI's board of directors, George Hubert, Jr., was an HEI vice president and secretary, Sharon Hubert was an HEI vice president, and J. Gregory Ollinger (Ollinger) was an HEI vice president.  From its organization through August 1, 1998, HEI did not declare a dividend or formally distribute any of its earnings and profits. HEI's undistributed earnings as of July 25, 1995, July 26, 1996, August 2, 1997, and August 1, 1998, were $14,847,028, $19,878,907, $25,164,181, and $31,298,257, respectively.

II.  HHC

In August 1999, HEI transferred the stock of its subsidiaries to HHC.  For HHC's 2000 and 2001 taxable years, HHC was the parent corporation of an affiliated group of corporations

that filed consolidated Federal corporate income tax returns. For HHC's 2000 taxable year, that affiliated group in addition to HHC consisted of the nine subsidiaries that were members of the HEI affiliated group in HEI's 1999 taxable year. For HHC's 2001 taxable year, the HHC affiliated group of corporations in addition to HHC consisted of (1) Printgraphics, (2) HBW, (3) Vogt, (4) HGT, and (5) Graphic. When HHC's petition was filed with the Court, its mailing address was in Cincinnati, Ohio.

III. HFT

Thomas and Stethem are unrelated by blood or marriage to any member of the Hubert family. Thomas and Stethem (sometimes collectively, trustees) were HFT's trustees. HFT'S settlors were Anthony Hubert, Benjamin Hubert, Brian Hubert, Christopher Hubert, Cynthia Hubert, Edward Hubert, George Hubert, Jr., Gregory Hubert, Joshua Hubert, Karen Hubert, Kathleen Hubert, Kimberly Hubert, Robert Hubert, Scott Hubert, Sharon Hubert, and Zachary Hubert (collectively, settlors). Edward Hubert, George Hubert, Jr., and Sharon Hubert (collectively, controlling settlors) have always held interests in HFT of 36.339 percent, 13.185 percent, and 16.488 percent, respectively. Anthony Hubert, Benjamin Hubert, Christopher Hubert, Joshua Hubert, Karen Hubert, Kathleen Hubert, Kimberly Hubert, Robert Hubert, Scott Hubert, and Zachary Hubert have each always held interests in HFT

of 3.095 percent. Brian Hubert, Cynthia Hubert, and Gregory Hubert have each always held interests in HFT of 1.012 percent. During their lives, the controlling settlors were to receive annually all income attributable to their respective percentage interests in the trust estate. Each of the other settlors was to receive annually the income attributable to his or her trust interest commencing as follows: (1) one-third at age 25, (2) two-thirds at age 30, and (3) 100 percent at age 35.

Stethem died in 2003. He had been legal counsel for the Hubert family and their companies. He drafted the trust agreement (trust agreement) underlying HFT, and the settlors and trustees executed the trust agreement on June 6, 1988. Under the trust agreement, the trustees had the absolute discretion to distribute HFT's money, securities, or other property, either pro rata or otherwise. The trust agreement also allowed the controlling settlors, generally upon majority consent, to alter, amend, or revoke the trust agreement. By amendments dated December 30, 1988, and January 1, 1991, the settlors and the trustees modified the trust agreement. Through the earlier amendment, the Howard Thomas Trust acquired the rights and privileges of a controlling settlor. Through the later amendment, the Katherine Hubert Trust acquired the rights and privileges of a controlling settlor.

IV.  <u>ALSL</u>

ALSL, also known as Seasons of Sarasota Limited Liability Co., is a Wyoming limited liability company organized on January 18, 1995.  ALSL was organized to provide funds to a limited partnership, Arbor Lake Development, Ltd. (ALD), to use to construct a retirement condominium community in Sarasota, Florida, to be known as the Seasons of Sarasota Retirement Community (Seasons of Sarasota).  For ALSL's taxable years ended December 31, 1995, 1996, and 1997, ALSL filed Federal partnership returns of income.  ALSL reported and had no revenue for those years.

From January 18, 1995, through December 31, 1997, ALSL's units were owned as follows:

| Member | Units |
| --- | --- |
| Edward Hubert | 20 |
| George Hubert, Jr. | 20 |
| Sharon Hubert | 20 |
| Ollinger | 5 |
| Stethem | 5 |
| Sun Valley Investments | 10 |
| Thomas | 20 |
| | 100 |

According to the ALSL operating agreement, (1) ALSL and all of its affairs were controlled by its members as a group, (2) the members' decisions by majority vote on the basis of membership interests controlled, and (3) absent approval by a majority vote, no single member had the power or authority to act on behalf of

ALSL.  During the relevant years, the owners of Sun Valley
Investments, a partnership, were Thomas and Stethem.

Pursuant to ALSL's operating agreement, ALSL's members were
required to contribute the following capital to ALSL:

| Member | Contribution |
|--------|--------------|
| Edward Hubert | $200 |
| George Hubert, Jr. | 200 |
| Sharon Hubert | 200 |
| Ollinger | 50 |
| Stethem | 50 |
| Sun Valley Investments | 100 |
| Thomas | 200 |
| | 1000 |

None of ALSL's members, with the exception of Thomas and Stethem,
ever contributed any capital to ALSL from his, her, or its own
funds.  During 1996, Thomas and Stethem contributed $200,000 and
$50,000, respectively, to ALSL's capital.[4]

As of December 31, 1995, ALSL reported for Federal income
tax purposes that it had cash of $7,298, that it owned a
$1,338,334 nonrecourse note receivable from ALD, and that it was
liable on a $1,345,684 nonrecourse note payable to HEI.  ALSL

---

[4] During HEI's 1997 taxable year, Thomas was HEI's most
highly compensated officer, and Edward Hubert, George Hubert,
Jr., and Sharon Hubert were its next three most highly
compensated officers.  During that year, HEI paid Thomas
$420,922, and it paid $370,236 to each of the other three
officers.  During HEI's 1998 taxable year, Thomas received
significantly less compensation than these other three officers.
During HEI's 1998 taxable year, HEI paid Edward Hubert, George
Hubert, Jr., Sharon Hubert, and Thomas $644,236, $894,236,
$644,236, and $397,342, respectively.

reported no other asset or liability as of that date, but for a $52 bank charge which it elected to amortize over 60 months.

As of December 31, 1996, ALSL reported for Federal income tax purposes that its sole asset was cash of $7,298 and that it had no liabilities. ALSL also reported for Federal income tax purposes that it had realized a $250,000 loss for 1996. ALSL reported that the loss was attributable to "Defeasance of Debt Income", "Bad Debt Losses", and "Miscellaneous Expenses" of $2,345,685, negative $2,588,376, and negative $7,309, respectively.

As of December 31, 1997, ALSL reported for Federal income tax purposes that it had no assets, liabilities, or capital.

V.  ALSL Note

Pursuant to a promissory note (ALSL note) dated January 18, 1995, ALSL (under the name Seasons of Sarasota Limited Liability Co.) promised to pay HEI "$2,500,000.00, or so much thereof as may be advanced and outstanding pursuant to any advances made by the Lender to the Company." The ALSL note was drafted as a demand note without a fixed maturity date, and it stated that it bore interest at a rate corresponding to the applicable Federal rate. In connection with the ALSL note, HEI transferred a total of $2,440,684.38 to ALSL from January 18, 1995, through March 6, 1997. ALSL then transferred those funds to ALD in connection with a January 18, 1995, nonrecourse promissory note (ALD note)

between ALD and ALSL.  ALD would repay these transferred funds to ALSL only upon the sale of condominium units in the Seasons of Sarasota project, and ALSL would repay HEI only when and if it received repayment from ALD.  In December 1996, HEI decided not to devote any more funds to the Seasons of Sarasota project.

In connection with the ALSL note, HEI transferred funds to ALSL and ALSL made repayments to HEI as follows:

| Date | Amount | Amount Repaid | Unpaid Balance |
|---|---|---|---|
| 1/18/95 | $20,000.00 | -0- | $20,000.00 |
| 1/18/95 | 698.00 | -0- | 20,698.00 |
| 2/24/95 | 15,000.00 | -0- | 35,698.00 |
| 3/3/95 | 20,000.00 | -0- | 55,698.00 |
| 3/7/95 | 15,000.00 | -0- | 70,698.00 |
| 3/10/95 | 10,000.00 | -0- | 80,698.00 |
| 3/15/95 | 84,302.00 | -0- | 165,000.00 |
| 3/24/95 | 7,500.00 | -0- | 172,500.00 |
| 3/24/95 | 75,000.00 | -0- | 247,500.00 |
| 4/4/95 | 25,000.00 | -0- | 272,500.00 |
| 4/11/95 | 220,000.00 | -0- | 492,500.00 |
| 6/9/95 | 100,000.00 | -0- | 592,500.00 |
| 6/23/95 | 100,000.00 | -0- | 692,500.00 |
| 6/26/95 | 50,000.00 | -0- | 742,500.00 |
| 6/30/95 | 368.40 | -0- | 742,868.40 |
| 7/14/95 | 50,000.00 | -0- | 792,868.40 |
| 7/31/95 | 1,366.58 | -0- | 794,234.98 |
| 8/1/95 | 50,000.00 | -0- | 844,234.98 |
| 8/15/95 | 50,000.00 | -0- | 894,234.98 |
| 8/21/95 | 50,000.00 | -0- | 944,234.98 |
| 8/31/95 | 356.53 | -0- | 944,591.51 |
| 9/5/95 | 50,000.00 | -0- | 994,591.51 |
| 10/31/95 | 1,092.87 | -0- | 995,684.38 |
| 11/27/95 | 50,000.00 | -0- | 1,045,684.38 |
| 12/7/95 | 50,000.00 | -0- | 1,095,684.38 |
| 12/27/95 | 50,000.00 | -0- | 1,145,684.38 |
| 1/8/96 | 50,000.00 | -0- | 1,195,684.38 |
| 2/5/96 | 50,000.00 | -0- | 1,245,684.38 |
| 2/12/96 | 50,000.00 | -0- | 1,295,684.38 |
| 3/6/96 | 75,000.00 | -0- | 1,370,684.38 |
| 3/8/96 | 75,000.00 | -0- | 1,445,684.38 |
| 4/12/96 | 50,000.00 | -0- | 1,495,684.38 |

| | | | |
|---|---|---|---|
| 4/29/96 | 50,000.00 | -0- | 1,545,684.38 |
| 5/13/96 | 50,000.00 | -0- | 1,595,684.38 |
| 6/6/96 | 50,000.00 | -0- | 1,645,684.38 |
| 6/10/96 | 100,000.00 | -0- | 1,745,684.38 |
| 6/28/96 | 50,000.00 | -0- | 1,795,684.38 |
| 7/2/96 | 75,000.00 | -0- | 1,870,684.38 |
| 7/12/96 | 50,000.00 | -0- | 1,920,684.38 |
| 7/31/96 | 50,000.00 | -0- | 1,970,684.38 |
| 8/21/96 | 50,000.00 | -0- | 2,020,684.38 |
| 9/5/96 | 75,000.00 | -0- | 2,095,684.38 |
| 9/10/96 | 50,000.00 | -0- | 2,145,684.38 |
| 10/8/96 | 50,000.00 | -0- | 2,195,684.38 |
| 10/21/96 | 50,000.00 | -0- | 2,245,684.38 |
| 11/12/96 | 50,000.00 | -0- | 2,295,684.38 |
| 12/2/96 | 50,000.00 | -0- | 2,345,684.38 |
| 1/9/97 | 26,000.00 | -0- | 2,371,684.38 |
| 1/21/97 | 15,000.00 | -0- | 2,386,684.38 |
| 1/27/97 | 5,000.00 | -0- | 2,391,684.38 |
| 2/5/97 | 13,000.00 | -0- | 2,404,684.38 |
| 2/12/97 | 11,000.00 | -0- | 2,415,684.38 |
| 2/14/97 | 5,000.00 | -0- | 2,420,684.38 |
| 2/19/97 | 5,000.00 | -0- | 2,425,684.38 |
| 3/6/97 | 15,000.00 | -0- | 2,440,684.38 |
| 7/14/97 | -0- | $43,418.06 | 2,397,266.32 |

HEI did not establish a written schedule for repayment of any of these transferred funds (or interest thereon), and HEI never demanded that ALSL repay any of the funds (or interest thereon). HEI never required that ALSL pledge any of its assets to secure repayment of any of the transferred funds, and ALSL never pledged any of its assets to secure such repayment. HEI never required that ALSL's members pledge security for repayment of any of the transferred funds, and ALSL's members never pledged any such security. ALSL's members never agreed to personally guarantee repayment of any of the transferred funds.

On or as of July 31, 1996, HEI recorded on the ALSL note that it was entitled to accrued interest of $93,200. This

interest was never paid.  HEI never accrued any other interest on the HEI note.

The $43,418.06 payment that ALSL made to HEI on July 14, 1997, resulted from a reported liquidation of ALD's assets in 1996.

VI.  <u>ALD</u>

ALD was a Florida limited partnership formed on January 6, 1995, to develop the Seasons of Sarasota.  ALD had one general partner, ALSL, and one limited partner, James Culpepper (Culpepper).  Thomas was an ALD officer.

Pursuant to the ALD limited partnership agreement, ALSL was to acquire a 97-percent interest in ALD in exchange for a $100 capital contribution, and Culpepper was to acquire a 3-percent interest in ALD in exchange for a $100,000 capital contribution. The limited partnership agreement stated that the percentages of the partners' interests in ALD did not have any relationship to their respective capital contributions.  Culpepper contributed the referenced $100,000 in 1995.  ALSL never contributed the referenced $100 as such.

For its taxable years ended December 31, 1995, 1996, and 1997, ALD filed Federal partnership returns of income.  ALD reported and had no revenue for those years.

As of December 31, 1995, ALD reported on its 1995 return that it had assets totaling $1,438,334 and a single liability of

$1,338,334. The assets consisted of cash of $37,172, accounts receivable of $1,714, deposits of $411,353, prepayments of $11,505, work in progress of $567,705, depreciable assets of $7,829, and intangible assets of $401,056. The single liability was the $1,338,334 nonrecourse note payable to ALSL.

As of December 31, 1996, ALD reported on its 1996 return that it had no assets or liabilities. On its 1996 return, ALD wrote off its intangible assets and reported a liquidation of its other assets.

As of December 31, 1997, ALD reported on its 1997 return that it had no assets or liabilities.

VII. ALD Note

The ALD note was a promissory note dated January 18, 1995, and payable to ALSL (under the name Seasons of Sarasota Limited Liability Co.) in the amount of "$2,750,000.00, or so much thereof as may be advanced and outstanding pursuant to any advances made by the Lender to the Partnership." The ALD note was drafted as a demand note without a fixed maturity date, and it stated that it bore interest at a rate corresponding to the applicable Federal rate. In connection with the ALD note, ALSL transferred a total of $2,690,531.88 to ALD from January 31, 1995, through March 31, 1997. ALSL transferred these funds to ALD and ALD made a repayment to ALSL as follows:

| Date | Amount | Amount Repaid | Unpaid Balance |
|------|--------|---------------|----------------|
| 1/31/95 | $20,698.00 | -0- | $20,698.00 |
| 2/28/95 | 19,442.85 | -0- | 40,140.85 |
| 2/28/95 | 10,570.73 | -0- | 50,711.58 |
| 3/31/95 | 82,500.00 | -0- | 133,211.58 |
| 3/31/95 | 5,000.00 | -0- | 138,211.58 |
| 3/31/95 | 101,825.86 | -0- | 240,037.44 |
| 4/30/95 | 25,000.00 | -0- | 265,037.44 |
| 4/30/95 | 220,000.00 | -0- | 485,037.44 |
| 6/30/95 | 100,000.00 | -0- | 585,037.44 |
| 6/30/95 | 100,000.00 | -0- | 685,037.44 |
| 6/30/95 | 368.40 | -0- | 685,405.84 |
| 6/30/95 | 50,000.00 | -0- | 735,405.84 |
| 7/5/95 | 112.40 | -0- | 735,518.24 |
| 7/28/95 | 50,000.00 | -0- | 785,518.24 |
| 7/31/95 | 1,366.58 | -0- | 786,884.82 |
| 8/1/95 | 50,000.00 | -0- | 836,884.82 |
| 8/15/95 | 50,000.00 | -0- | 886,884.82 |
| 8/21/95 | 50,000.00 | -0- | 936,884.82 |
| 8/31/95 | 356.53 | -0- | 937,241.35 |
| 9/5/95 | 50,000.00 | -0- | 987,241.35 |
| 9/15/95 | 50,000.00 | -0- | 1,037,241.35 |
| 10/3/95 | 50,000.00 | -0- | 1,087,241.35 |
| 10/4/95 | 564.00 | -0- | 1,087,805.35 |
| 10/9/95 | 58.28 | -0- | 1,087,863.63 |
| 10/16/95 | 50,000.00 | -0- | 1,137,863.63 |
| 10/24/95 | 470.59 | -0- | 1,138,334.22 |
| 10/27/95 | 50,000.00 | -0- | 1,188,334.22 |
| 11/30/95 | 50,000.00 | -0- | 1,238,334.22 |
| 12/7/95 | 50,000.00 | -0- | 1,288,334.22 |
| 12/27/95 | 50,000.00 | -0- | 1,338,334.22 |
| 1/31/96 | 50,000.00 | -0- | 1,388,334.22 |
| 2/29/96 | 50,000.00 | -0- | 1,438,334.22 |
| 2/29/96 | 50,000.00 | -0- | 1,488,334.22 |
| 3/31/96 | 50,000.00 | -0- | 1,538,334.22 |
| 3/31/96 | 50,000.00 | -0- | 1,588,334.22 |
| 3/31/96 | 75,000.00 | -0- | 1,663,334.22 |
| 4/30/96 | 50,000.00 | -0- | 1,713,334.22 |
| 4/30/96 | 75,000.00 | -0- | 1,788,334.22 |
| 5/31/96 | 50,000.00 | -0- | 1,838,334.22 |
| 6/30/96 | 200,000.00 | -0- | 2,038,333.22 |
| 7/31/96 | 175,000.00 | -0- | 2,213,334.22 |
| 8/31/96 | 50,000.00 | -0- | 2,263,334.22 |
| 9/30/96 | 125,000.00 | -0- | 2,388,334.22 |
| 10/31/96 | 100,000.00 | -0- | 2,488,334.22 |
| 11/30/96 | 50,000.00 | -0- | 2,538,334.22 |
| 12/31/96 | 50,000.00 | -0- | 2,588,334.22 |

| 1/31/97 | 7,197.66 | -0- | 2,595,531.88 |
| 1/31/97 | 46,000.00 | -0- | 2,641,531.88 |
| 2/28/97 | 34,000.00 | -0- | 2,675,531.88 |
| 3/31/97 | 15,000.00 | -0- | 2,690,531.88 |
| 7/10/97 | 5,000.00 | $43,418.06 | 2,647,213.82 |

ALD used the transferred funds received from ALSL to pay ALD's operating expenses incurred in connection with the Seasons of Sarasota project, including professional fees for site plans, construction drawings, environmental assessments, surveying, marketing studies, and expenses of the sales staff.  ALSL did not establish a written schedule for repayment of any of these transferred funds (or interest thereon), and ALSL never demanded that ALD repay any of the funds (or interest thereon).  ALSL never required that ALD pledge any of its assets to secure repayment of any of the transferred funds, and ALD never pledged any of its assets to secure such repayment.  ALSL never required that ALD's members pledge security for repayment of any of the transferred funds, and ALD's members never pledged any such security.  ALD's members never agreed to personally guarantee repayment of any of the transferred funds.

The $43,418.06 payment that ALD made to ALSL on July 10, 1997, resulted from the reported liquidation of ALD's assets in 1996.

VIII.  <u>Seasons of Sarasota</u>

On October 24, 1994, William Shaner (Shaner) delivered documentation to Seasons Management Co. (SMC) describing the

Seasons of Sarasota project. Shaner later told HEI about the possibility of investing in the project. Afterwards, in 1994, Thomas retained an appraisal and consulting firm to prepare a detailed analysis of the market for a retirement community in Sarasota. The firm delivered such an analysis to Thomas on December 23, 1994, in the form of a 39-page report (exclusive of addenda) entitled "Analysis of Service Enhanced Retirement Facility Market in Sarasota, Florida". At the request of Thomas, the firm on June 26, 1996, updated its analysis and conclusions reflected in that report.

Eugene Schwartz (Schwartz) is unrelated by blood or marriage to Thomas, Stethem, or any member of the Hubert family. In January 1995, ALSL agreed to pay $3 million to Schwartz for 49.8 acres in Sarasota on which the Seasons of Sarasota was proposed to be built. As a condition to the agreement, ALSL had to obtain commitments from buyers of at least 59 condominium units which were to be built on the land. Absent written notice to the seller, ALSL had until December 31, 1995, to purchase the land from Schwartz. Also in January 1995, SMC and ALD agreed that SMC would direct the marketing of, manage, and operate the Seasons of Sarasota. The duties and responsibilities of SMC were to begin on January 1, 1995, and continue until December 31, 2004, unless terminated earlier.

The plan for the Seasons of Sarasota called for 298 individually owned condominium units with one to three bedrooms, a 30,000-square-foot clubhouse, and an 80-unit assisted living facility. Pursuant to the plan, construction of 98 condominium units would start in the fall of 1996. The construction of the Seasons of Sarasota was to be financed in phases with each phase consisting of approximately one-third of the projected 298 condominium units.

On June 24, 1996, Provident Bank (Provident) relayed to Thomas the possibility of Provident's lending funds to ALD. Provident would make the loan only if certain conditions were met. One condition was that HEI be a comaker of the loan and agree to certain financial covenants such as maintaining a stated debt to equity ratio and a stated minimum net worth. A second condition was that ALD procure in the first phase of construction at least 45 firm contracts to purchase condominium units with a total gross sale price of at least $10.8 million and total initial earnest money deposits of at least $1.62 million. A third condition was the monthly payment on the loan of accrued interest and principal. A fourth condition was that the loan be secured. A fifth condition was that the earnest money from sales be deposited with Provident.

Through June 30, 1996, 34 condominium units in the Seasons of Sarasota were reserved with refundable deposits. By the

latter part of 1996, some individuals who had reserved condominium units canceled their reservations, and the number of cancellations exceeded the number of new reservations. By December 31, 1996, ALD had not sold 45 of the condominium units planned for the first phase.

ALD never purchased the land from Schwartz, and the construction of the Seasons of Sarasota never began. Nor did Provident ever lend any funds to ALD, ALSL, or HEI. On December 31, 1996, the duties and responsibilities of SMC ended when SMC and ALD agreed to terminate their agreement because the land had not been purchased.

IX. LCL

LCL is a Wyoming limited liability company formed on April 30, 1998. LCL filed its initial Federal partnership return of income on the basis of a taxable year ended July 31, 1998 (LCL's 1998 taxable year). LCL's organizers were Thomas, in his capacity as managing member of Hubert Commerce Center, Inc. (HCC), and Ollinger, in his capacity as vice president of HBW. HCC was connected with both the HEI and HHC affiliated groups.

LCL's ownership consisted of 100 membership units. During LCL's 1998 taxable year, HBW received 99 of those units in exchange for a $9,900 capital contribution, and HCC received the last unit in exchange for a $100 capital contribution. On April 30, 1998, HBW and LCL also executed as a contribution to

LCL's capital an assignment in which HBW transferred to LCL all of HBW's rights, title, and interest in its leases, subject to existing loans.

Section 4.2 of LCL's operating agreement stated that "No Member shall be liable as such for the liabilities of the Company." On March 28, 2001, the LCL operating agreement was amended and restated in its entirety (revised LCL operating agreement), effective retroactively to January 1, 2000. The revised LCL operating agreement is construed under Wyoming law, and only the parties who signed the revised LCL operating agreement (and their successors in interest) have any rights or remedies under that agreement. The revised LCL operating agreement stated that neither HBW nor HCC was required to make any additional capital contribution to LCL. The revised LCL operating agreement also stated:

> 7.7  <u>Deficit Capital Account Restoration</u>.  If any Partner has a deficit Capital Account following the liquidation of his, her or its interest in the partnership, then he, she or it shall restore the amount of such deficit balance to the Partnership by the end of such taxable year or, if later, within 90 days after the date of such liquidation, for payment to creditors or distribution to Partners with positive capital account balances.

In 2000 and 2001, neither HBW nor HCC liquidated its interest in LCL. Nor at those times did either member have a deficit in its LCL capital account.

X.  Equipment Leasing Activities

   A.  1991 Rapistan Conveyor System

   Starwood Corp. (Starwood), Ministers Life--A Mutual Life Insurance Co. (Ministers Life), Inter-Market Capital Corp. (Inter-Market), and General Motors Corp. (GM) are corporations unaffiliated with any Hubert company.  Pursuant to agreements dated April 30 and June 25, 1991, Starwood leased a 1991 Rapistan conveyor system to GM.  The term of that lease included the 180-month period beginning November 1, 1991.  For each of those 180 months, GM agreed to pay $13,659.83 on the first day of the month, beginning November 1, 1991.

   On October 1, 1991, Starwood purchased the 1991 Rapistan conveyor system from Ministers Life for $1,327,237.89.  All payments on that purchase were to be made from proceeds from the lease of the 1991 Rapistan conveyor system.  The payment schedule for the October 1, 1991, promissory note underlying the purchase anticipated that the monthly payments would be $13,659.83, starting November 1, 1991.

   On October 31, 1991, Printgraphics purchased the 1991 Rapistan conveyor system (subject to the lease) from Starwood for $1,412,468.68.  On the same day, Printgraphics paid Starwood $75,000 towards that purchase price and financed the rest by assuming liability for the October 1, 1991, promissory note between Starwood and Ministers Life.  For each of its taxable

years ended in 1992 through 1998, Printgraphics reported as to the 1991 Rapistan conveyor system the following amounts of lease income, interest expense, depreciation, and loss:

|                  | 1992       | 1993       | 1994       | 1995       | 1996       | 1997      | 1998       |
|------------------|------------|------------|------------|------------|------------|-----------|------------|
| Lease income     | $122,938   | $163,918   | $163,918   | $163,918   | $163,918   | $163,918  | $122,940   |
| Interest expense | (80,877)   | (117,907)  | (113,466)  | (108,596)  | (103,256)  | (97,401)  | (68,234)   |
| Depreciation     | (201,842)  | (345,913)  | (247,041)  | (176,417)  | (126,133)  | (125,992) | (94,228)   |
| Loss             | 159,781    | 299,902    | 196,589    | 121,095    | 65,471     | 59,475    | 39,522     |

B.  1995 Computer Equipment

Capital Resources Group, Inc. (CRG), is a corporation unaffiliated with any Hubert company.  On April 30, 1995, Starwood sold computer equipment (1995 computer equipment) to CRG for $6,822,000, and CRG leased the 1995 computer equipment back to Starwood.  Pursuant to promissory notes dated April 30, 1995, CRG promised to pay $445,538 and $6,058,983 to Starwood as to the sale.

Also on April 30, 1995, Printgraphics purchased the 1995 computer equipment (subject to the lease) from CRG for $6,822,000.  Printgraphics paid CRG $360,000 and issued CRG a short-term promissory note for $445,538 and an installment promissory note for $6,016,462.  The installment note stated it was recourse to the extent of $2.2 million and that payments of principal on the recourse portion would be reduced pro rata to the extent the outstanding indebtedness on the note was reduced. For each of its taxable years ended in 1995 through 1998, Printgraphics reported as to the 1995 computer equipment the

following amounts of lease income, interest expense, depreciation, and income/(loss):

|  | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|
| Lease income | -0- | $1,157,816 | $1,646,796 | $1,341,589 |
| Interest expense | ($150,412) | (433,423) | (490,523) | (285,889) |
| Depreciation | (1,364,400) | (2,183,040) | (1,309,824) | (589,467) |
| Income/(loss) | (1,514,812) | (1,458,647) | (153,551) | 466,233 |

C.  1998 Amtel Equipment

Amtel Corp. (Amtel) and Third Street Services, Inc. (TSS), are corporations that are unaffiliated with any Hubert company. On April 30, 1998, CRG purchased from Starwood for $8,927,204.90 a 60.55-percent interest (60.55-percent interest) in certain equipment (1998 Amtel equipment) leased by TSS to Amtel. Pursuant to promissory notes dated April 30, 1998, CRG agreed to pay Starwood $8,222,860.90 and $235,000.  Also on April 30, 1998, CRG leased the 60.55-percent interest back to Starwood for an 86-month term beginning August 1, 1998.

Also on April 30, 1998, LCL purchased the 60.55-percent interest (subject to the lease) from CRG for $8,927,204.90. Pursuant to promissory notes dated April 30, 1998, LCL agreed to pay CRG $8,172,204.90 and $235,000.  No individual member of LCL signed or directly guaranteed these promissory notes, the first of which stated it was recourse to the extent of $4.75 million and that payments of principal and interest would be applied to the recourse portion before the nonrecourse portion.  The second note stated it was nonrecourse.

On July 31, 1998, CRG purchased from Starwood the remaining 39.45-percent interest (39.45-percent interest) in the 1998 Amtel equipment for $5,814,720.10, and CRG leased the 39.45-percent interest back to Starwood. Pursuant to promissory notes dated July 31, 1998, CRG promised to pay Starwood $5,346,686.52 and $53,932.54.

Also on July 31, 1998, LCL purchased the 39.45-percent interest (subject to the lease) from CRG for $5,814,720.10. Pursuant to promissory notes dated July 31, 1998, LCL promised to pay CRG $5,310,887.56 and $53,832.54. No individual member of LCL signed or guaranteed these notes, the first of which stated it was recourse to the extent of $2.75 million and that payments of principal and interest would be applied to the recourse portion before the nonrecourse portion. The second note stated it was nonrecourse.

For each of its taxable years ended in 1998 through 2001, LCL reported as to the 1998 Amtel equipment the following amounts of lease income, interest expense, depreciation, net "G&A" expense and interest income, and loss:

|  | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|
| Lease income | -0- | $1,987,157 | 2,167,807 | $2,167,807 |
| Interest expense | ($156,167) | (971,811) | (877,785) | (786,273) |
| Depreciation | (2,948,385) | (4,717,416) | (2,830,450) | (1,698,270) |
| Net G&A expense and interest income | -0- | 4,047 | 32,922 | 13,815 |
| Loss | 3,104,552 | 3,698,023 | 1,507,506 | 302,921 |

The portions of these losses allocated to HBW's 99-percent ownership interest were $3,073,507, $3,661,043, $1,492,431, and $299,892, respectively.

> D.  1999 Blisk Equipment

Relational Funding Corp. (RFC) is a corporation that is unaffiliated with any Hubert company.  On April 30, 1999, RFC sold (subject to a lease) a Lear Precision ECM 1999 blisk machine (1999 blisk equipment) to LCL for $2,950,382.86.  At that time, the 1999 blisk equipment was leased to General Electric Aircraft Engines.  LCL paid $133,000 towards the purchase, issued to RFC a $30,742 short-term note, assumed a $403,505.60 long-term note of RFC, and assumed RFC's position with respect to lender liens on the 1999 blisk equipment.

For each of its taxable years ended in 1999 through 2001, LCL reported as to the 1999 blisk equipment the following amounts of lease income, interest expense, depreciation, "G&A" expense and interest income, and loss:

|  | 1999 | 2000 | 2001 |
|---|---|---|---|
| Lease income | $108,296 | $433,185 | $433,185 |
| Interest expense | (35,449) | (172,353) | (154,497) |
| Depreciation | (421,484) | (722,543) | (516,022) |
| Net G&A expense and interest income | 221 | 6,579 | 2,761 |
| Loss | 348,416 | 455,132 | 234,573 |

The portions of these losses allocated to HBW's 99-percent ownership interest were $344,932, $440,672, and $232,227, respectively.

E.   2000 Computer Equipment

On April 30, 2000, CRG purchased computer equipment (2000 computer equipment) from RFC for $765,326.  Pursuant to promissory notes dated April 30, 2000, CRG agreed to pay RFC $56,850 and $672,101.  On the same day, CRG leased the 2000 computer equipment back to RFC.

Also on April 30, 2000, LCL purchased the 2000 computer equipment (subject to the lease) from CRG for $765,326, and LCL executed promissory notes to CRG in the amounts of $56,850 and $667,766.  No individual member of LCL signed or directly guaranteed the notes, the latter of which stated it was recourse to the extent of $340,000 and that payments of principal would be applied first to the recourse portion.  For each of its taxable years ended in 2000 and 2001, LCL reported as to the 2000 computer equipment the following amounts of lease income, interest expense, depreciation, "G&A" expense and interest income, and loss:

|                        | 2000       | 2001      |
|------------------------|------------|-----------|
| Lease income           | -0-        | $100,341  |
| Interest expense       | ($17,065)  | (48,816)  |
| Depreciation           | (153,065)  | (244,904) |
| Net G&A expense and interest income | -0- | 639 |
| Loss                   | 170,130    | 192,740   |

The portions of these losses allocated to HBW's 99-percent ownership interest were $168,429 and $190,813, respectively.

F.  2000 RFC Equipment

On April 30, 2000, CRG purchased computer equipment (2000 RFC equipment) from RFC for $9,181,432 and leased the 2000 RFC equipment back to RFC.  Pursuant to promissory notes dated April 30, 2000, CRG promised to pay RFC $663,400 and $8,080,320 as to the purchase.

Also on April 30, 2000, LCL purchased the 2000 RFC computer equipment (subject to the lease) from CRG for $9,181,432.  Pursuant to promissory notes dated April 30, 2000, LCL promised to pay CRG $663,400 and $8,029,222.  No individual member of LCL signed or directly guaranteed the notes, the latter of which stated it was recourse to the extent of $3.225 million and that payments of principal and interest would be applied first to the recourse portion.  For each of its taxable years ended in 2000 and 2001, LCL reported as to the 2000 RFC equipment the following amounts of lease income, interest expense, depreciation, "G&A" expense and interest income, and loss:

|  | 2000 | 2001 |
|---|---|---|
| Lease Income | -0- | $1,545,155 |
| Interest expense | ($205,190) | (508,995) |
| Depreciation | (1,836,287) | (2,938,058) |
| Net G&A expense and interest income | -0- | 9,848 |
| Loss | 2,041,477 | 1,892,050 |

The portions of these losses allocated to HBW's 99-percent ownership interest were $2,021,062 and $1,873,130 respectively.

OPINION

I.  Transferred Funds

    A.  Overview

    Petitioners argue primarily that HEI's transfers to ALSL created debt which became uncollectible in HEI's 1997 taxable year, thus for that year entitling HEI to a bad debt deduction under section 166.[5]  Alternatively, petitioners argue, the transfers were HEI's contribution to the capital of ALSL, which entitled HEI for its 1997 taxable year to deduct an ordinary loss resulting from a loss of that capital.  Respondent argues that the transfers were not debt.  Respondent also argues that the transfers were not capital contributions made by HEI, noting that ALSL was owned not by HEI but primarily by the individuals who controlled HEI.

    We agree with respondent that HEI is not entitled to either of its desired deductions with respect to the transfers.  We conclude that the transfers were not deductible for HEI's 1997 taxable year as debt nor as contributions made by HEI to the capital of ALSL.

---

    [5] Sec. 166(a)(1) provides that a taxpayer may deduct as an ordinary loss a debt which becomes worthless during the taxable year.

B.  Petitioners' Claim to a Bad Debt Deduction

Petitioners bear the burden of proving that the transfers are debt.[6]  See Rule 142(a)(1); Roth Steel Tube Co. v. Commissioner, 800 F.2d 625, 630 (6th Cir. 1986), affg. T.C. Memo. 1985-58; Smith v. Commissioner, 370 F.2d 178, 180 (6th Cir. 1966), affg. T.C. Memo. 1964-278.  Debt for Federal income tax purposes connotes an existing, unconditional, and legally enforceable obligation to repay.  See Roth Steel Tube Co. v. Commissioner, supra at 630; First Natl. Co. v. Commissioner, 289 F.2d 861, 864-865 (6th Cir. 1961), revg. and remanding 32 T.C. 798 (1959); Burrill v. Commissioner, 93 T.C. 643, 666 (1989); see also AMW Invs., Inc. v. Commissioner, T.C. Memo. 1996-235.  Transfers between related parties are examined with special scrutiny.  Cf. Roth Steel Tube Co. v. Commissioner, supra at 630.  A transfer's economic substance prevails over its form, see Smith v. Commissioner, supra at 180; Byerlite Corp. v. Williams, 286 F.2d 285, 291 (6th Cir. 1960), and a finding of economic substance turns on whether the transfer would have followed the same form had it been between the transferee and an

---

[6] Petitioners have not raised the issue of sec. 7491(a), which shifts the burden of proof to the Commissioner in certain situations, and we conclude that sec. 7491(a) does not apply. In the case of a corporation such as each petitioner, sec. 7491(a)(2) limits the shifting of the burden of proof to situations where, among other things, the corporation shows that upon filing its petition in this Court, its net worth was no more than $7 million.  See also 28 U.S.C. sec. 2412(d)(2)(B) (2000). Neither petitioner has made such a showing.

independent lender, see <u>Scriptomatic, Inc. v. United States</u>, 555 F.2d 364 (3d Cir. 1977). The more a transfer appears to result from an arm's-length transaction, the more likely the transfer will be considered debt. See <u>Bayer Corp. v. Mascotech, Inc. (In re Autosytle Plastics, Inc.)</u>, 269 F.3d 726, 750 (6th Cir. 2001). The subjective intent of the parties to a transfer that the transfer create debt does not override an objectively indicated intent to the contrary. See <u>Stinnett's Pontiac Serv., Inc. v. Commissioner</u>, 730 F.2d 634, 639 (11th Cir. 1984), affg. T.C. Memo. 1982-314.

In the case of transfers from shareholders to their corporations, courts generally refer to numerous factors to determine whether the transfers create debt. Petitioners argue that such an approach is irrelevant where, as here, a transfer is made to a partnership rather than a corporation. Petitioners assert that the Court in a case such as this must focus solely on the form of the document connected with the transfer (here, the ALSL note) and decide whether that document establishes a debtor-creditor relationship under applicable State law. We disagree. Petitioners have cited no authority to support their view, and we believe that the relevant factors distinguishing debt from equity are most helpful to us in deciding whether HEI transferred the disputed funds to ALSL in an arm's-length transaction made with a genuine intention to create a debt. See <u>Berthold v.</u>

Commissioner, 404 F.2d 119, 122 (6th Cir. 1968) ("Established authority holds that the intention of the parties is the controlling factor in determining whether or not advances should be termed loans."), affg. T.C. Memo. 1967-102; cf. Recklitis v. Commissioner, 91 T.C. 874, 905 (1988).

The Court of Appeals for the Sixth Circuit, to which an appeal of this case most likely lies, refers primarily to eleven factors in distinguishing debt from equity. See Roth Steel Tube Co. v. Commissioner, supra at 630. These factors are: (1) The name given to an instrument underlying a transfer of funds; (2) the presence or absence of a fixed maturity date and a schedule of payments; (3) the presence or absence of a fixed interest rate and actual interest payments; (4) the source of repayment; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between creditors and equity holders; (7) the security for repayment; (8) the transferee's ability to obtain financing from outside lending institutions; (9) the extent to which repayment was subordinated to the claims of outside creditors; (10) the extent to which transferred funds were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayment. Id. No one factor is controlling, and courts must consider the particular circumstances of each case. Id.

We turn to analyzing and weighing the relevant facts of this case in the context of the 11 factors set forth in Roth Steel Tube Co. v. Commissioner, supra.

### 1. Name of Certificate

We look to the name of the certificate evidencing a transfer to determine whether the parties thereto intended that the transfer create debt. Although the issuance of a note weighs toward a finding of bona fide debt, see Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics, Inc.), supra at 750; Estate of Mixon v. United States, 464 F.2d 394, 403 (5th Cir. 1972), the mere fact that a taxpayer issues a note is not dispositive. The issuance of a demand note is not indicative of genuine debt when the note is unsecured, without a maturity date, and without meaningful repayments. See Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 638; Tyler v. Tomlinson, 414 F.2d 844, 849 (8th Cir. 1969).

We give little weight to the fact that ALSL issued the ALSL note to HEI. The ALSL note was a demand note with no fixed maturity date, no written repayment schedule, no provision requiring periodic payments of principal or interest, no collateral, and no meaningful repayments. In addition, HEI never made a demand for repayment or otherwise sought enforcement of the ALSL note. See Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 640 (the fact that notes were due on

demand but that the obligee never demanded payments supports a strong inference that the obligee never intended to compel the obligor to repay the notes).  Although both HEI and ALSL posted in their records that the transfers were loans, those postings provide little if any support for a finding of bona fide debt. Roth Steel Tube Co. v. Commissioner, 800 F.2d at 631 (citing Raymond v. United States, 511 F.2d 185, 191 (6th Cir. 1975)).

Petitioners argue that HEI asserted its rights as a lender by receiving all of the existing capital of ALSL upon its demise. According to petitioners, had the transfers not been debt, then a portion of that capital would have gone to Stethem and Thomas, who together contributed $250,000 of capital to ALSL.  We consider this argument unpersuasive.  We find nothing in the record to support petitioners' claim that HEI asserted its rights as a lender by receiving all of the existing capital of ALSL upon its claimed demise.[7]  We also find nothing in the record to support petitioners' claim that Stethem and Thomas failed to receive anything of value as to their capital contributions. Stethem and Thomas were fixtures in most of the financial ventures of the Hubert family and their companies.  In addition

---

[7] Nor do we find that the business of either ALSL or ALD ceased in 1996 or 1997, as petitioners claim.  Indeed, in and after December 1996, HEI made to ALSL nine transfers totaling $145,000, and ALSL made to ALD six transfers totaling $157,197.66.  HEI also did not receive the reported liquidation proceeds until July 14, 1997.

to serving with Thomas as a trustee of the HFT, Stethem was legal counsel for the Hubert family and their companies and presumably made a good living in that capacity. Thomas was HEI's longtime president and in that capacity received more than $800,000 in compensation in just HEI's 1997 and 1998 taxable years alone. We also note that Thomas as of the time of trial continued to work for the Hubert enterprise as its chief executive officer and that his $200,000 contribution to ALSL's capital was contemporaneous with his receipt from HEI of an amount of officer compensation that appears to have been inflated to enable him to make that contribution.

This factor weighs toward a finding that the transfers did not create bona fide debt.

## 2. Fixed Maturity Date and Schedule of Payments

The absence of a fixed maturity date and a fixed obligation to repay weighs against a finding of bona fide debt. See Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics, Inc.), 269 F.3d at 750; Roth Steel Tube Co. v. Commissioner, supra at 631.

The ALSL note had no fixed maturity date. While petitioners assert that the ALSL note was a demand note for which payment could have been requested at any time, the fact of the matter is that HEI never made any such demand and, more importantly, ALSL never had the ability to honor such a request had one been made. ALSL made its first (and only) payment on the ALSL note

approximately 2-1/2 years after HEI's first transfer to ALSL and did so only on account of ALD's claimed liquidation. Moreover, notwithstanding this lack of repayments throughout the referenced 2-1/2-year period, HEI continued to transfer funds to ALSL without any schedule for repayment. HEI even transferred a total of $95,000 to ALSL in 1997 even though in December 1996 HEI decided to stop funding the Seasons of Sarasota project and ALSL treated the "debt" as discharged on its Federal income tax return for 1996.

Petitioners ask the Court to conclude that the issuance of the ALSL note as a demand note strongly supports a finding of debt because the obligeee of a demand note, unlike an equity holder, may at any time demand repayment. We decline to reach such a conclusion. As noted by the Court of Appeals for the Eleventh Circuit, "an unsecured note due on demand with no specific maturity date, and no payments is insufficient to evidence a genuine debt." Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d at 638; cf. Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics, Inc.), supra at 750 ("use of demand notes along with a fixed rate of interest and interest payments is more indicative of debt than equity" (Emphasis added.)). Repayment of the ALSL note was unsecured, HEI never prepared a written repayment schedule as to the transfers, and ALSL never had assets available to pay all, or even a significant part, of

the ALSL note.  Whether or when to make demand for repayment of the transfers was within the discretion of HEI and was not conditioned upon the occurrence of any stated event.  See Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 639.

This factor weighs toward a finding that the transfers did not create bona fide debt.

### 3.  Interest Rate and Actual Interest Payments

A reasonable lender is concerned about receiving payments of interest as compensation for, and commensurate with, the risk assumed in making the loan.  See id. at 640; cf. Deputy v. du Pont, 308 U.S. 488, 498 (1940) (in the business world, interest is paid on debt as "compensation for the use or forbearance of money").  The absence of an adequate rate of interest and actual interest payments weighs strongly against a finding of bona fide debt.  See Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics, Inc.), supra at 750; Roth Steel Tube Co. v. Commissioner, supra at 631.

Although the ALSL note on its face bore a rate of interest, the facts of this case persuade us that the parties to the note did not intend that ALSL actually pay HEI any (let alone a market rate of) interest for the use of the transferred funds unless the Seasons of Sarasota project was successful.  We do not believe that a reasonable lender would have lent unsecured funds to ALSL, a company with no revenues and few liquid assets, at the rate of

interest stated in the ALSL note.  A transferor of funds who does not insist on reasonable interest payments as to the use of the funds may not be a bona fide lender.  See Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 640.

ALSL never paid any interest to HEI as to the transferred funds and made but a single, nominal payment as to the principal of those funds.  Petitioners assert that payments were not made because neither principal nor interest was ever due under the terms of the ALSL note.  We consider this assertion unavailing.  Indeed, HEI did not even report that accrued interest was owing on the ALSL note until more than 18 months after the first transfer of funds.

This factor weighs toward a finding that the transfers did not create bona fide debt.

### 4. Source of Repayment

Repayment that depends solely upon the success of the transferee's business weighs against a finding of bona fide debt. Repayment that does not depend on earnings weighs toward a finding of debt.  See Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics, Inc.), supra at 751; Roth Steel Tube Co. v. Commissioner 800 F.2d at 632; Lane v. United States, 742 F.2d 1311, 1314 (11th Cir. 1984).  "An expectation of repayment solely from * * * earnings is not indicative of bona fide debt regardless of its reasonableness."  Roth Steel Tube Co. v.

Commissioner, supra at 631 (citing Lane v. United States, supra at 1314); see also Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 638-639; Raymond v. United States, 511 F.2d at 191; Segel v. Commissioner, 89 T.C. 816, 830 (1987); Deja Vu, Inc. v. Commissioner, T.C. Memo. 1996-234.

HEI's transfers to ALSL were placed at the risk of ALSL's business. ALSL's ability to repay these transfers depended primarily (if not solely) on its earnings, which in turn rested on the success of ALD and the Seasons of Sarasota project. ALSL was unable to repay the ALSL note as ALSL had no revenue and virtually no liquid assets.

This factor weighs toward a finding that the transfers did not create bona fide debt.

### 5. Capitalization

Thin or inadequate capitalization to fund a transferee's obligations weighs against a finding of bona fide debt. See Roth Steel Tube Co. v. Commissioner, supra at 630; Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 639.

The record indicates that ALSL was inadequately capitalized to be, as it was, the funding vehicle for ALD and that ALSL had no meaningful capital, apart from the transferred funds, either before or when it received the transferred funds. While ALSL received capital contributions totaling $250,000 from Thomas and Stethem, that amount was small in comparison to the amount of the

transferred funds and minuscule in comparison to the cost of the Seasons of Sarasota project. As to that project, ALD agreed to pay $3 million for land and had agreed to pay construction-related costs potentially totaling millions of dollars more. For its own equity capitalization, ALD had only $100,000 from its limited partner Culpepper.

This factor weighs toward a finding that the transfers did not create bona fide debt.

### 6. Identity of Interest

Transfers made in proportion to ownership interests weigh against a finding of bona fide debt. A sharply disproportionate ratio between an ownership interest and the debt owing to the transferor by the transferee generally weighs toward a finding of debt. See Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics, Inc.), 269 F.3d at 751; Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d at 630; Estate of Mixon v. United States, 464 F.2d at 409.

HEI was not an owner of ALSL. HFT's controlling settlors and trustees were. In fact, the only portion of ALSL not owned by those individuals was the 5-percent interest owned by Ollinger, an HEI vice president, who never made any contribution of capital to ALSL in return for his interest. The individuals who controlled HEI effectively caused HEI to fund their investment in ALSL.

This factor is either inapplicable or does not support a finding that the transfers created bona fide debt.

### 7.   Presence or Absence of Security

The absence of security for the repayment of transferred funds weighs strongly against a finding of bona fide debt.  See Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics, Inc.), supra at 752; Roth Steel Tube Co. v. Commissioner, supra at 632; Lane v. United States, supra at 1317; Raymond v. United States, supra at 191; Austin Village, Inc. v. United States, 432 F.2d 741, 745 (6th Cir. 1970).

The disputed transfers were unsecured.

This factor weighs toward a finding that the transfers did not create bona fide debt.

### 8.   Inability To Obtain Comparable Financing

The question of whether a transferee could have obtained comparable financing from an independent source is relevant in measuring the economic reality of a transfer.  See Roth Steel Tube Co. v. Commissioner, supra at 631; Estate of Mixon v. United States, supra at 410; Nassau Lens Co. v. Commissioner, 308 F.2d 39, 47 (2d Cir. 1962), remanding 35 T.C. 268 (1960).  Evidence that a transferee could not at the time of the transfer obtain a comparable loan from an arm's-length creditor weighs against a finding of bona fide debt.  See Roth Steel Tube Co. v. Commissioner, supra at 631; Stinnett's Pontiac Serv., Inc. v.

Commissioner, supra at 640; Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 287 (1990).

We do not believe that a creditor dealing at arm's length would have made the transfers to ALSL under the terms that petitioners allege were entered into between ALSL and HEI.  In fact, ALD discussed borrowing funds from a commercial lender; i.e., Provident.  Although Provident did not lend any funds to ALD, the terms of the proposed financing arrangement were different in many regards from those contained in the ALSL note.  First, Provident would have required that HEI be a co-maker of the note.  Second, Provident would have required that HEI agree to certain financial covenants such as the maintenance of a stated debt to equity ratio and a stated minimum net worth.  Third, Provident would have required the borrower to provide security, collateral, and earnest money and to pay accrued interest and principal monthly.  Fourth, Provident would have required that ALD have in the first phase of construction at least 45 firm contracts to purchase condominium units with a total gross sale price of at least $10.8 million and total initial earnest money deposits of at least $1.62 million.  Fifth, Provident would have required that any earnest money from the sales be deposited with Provident.  None of these requirements, or anything like them, was contained in the financing arrangement between ALSL and HEI.

This factor weighs toward a finding that the transfers did not create bona fide debt.

### 9. Subordination

Subordination of purported debt to the claims of other creditors weighs against a finding of bona fide debt. See Roth Steel Tube Co. v. Commissioner, 800 F.2d at 631-632; Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 639; Raymond v. United States, 511 F.2d at 191; Austin Village, Inc. v. United States, supra at 745.

ALSL has never had any creditors. Given that the transfers were unsecured, however, their right to repayment would have been subordinate to the interests of any secured creditors.

This factor is either inapplicable or does not support a finding that the transfers created bona fide debt.

### 10. Use of Funds

A transfer of funds to meet the transferee's daily business needs weighs toward a finding of debt. A transfer of funds to purchase capital assets weighs against a finding of bona fide debt. See Roth Steel Tube Co. v. Commissioner, supra at 632; Stinnett's Pontiac Serv., Inc. v. Commissioner, supra at 640; Raymond v. United States, supra at 191.

The transfers were not used to pay ALSL's daily operating expenses because ALSL had no operating expenses. Although the transfers also were not used to acquire tangible capital assets,

the transfers were used by ALSL in a similar sense in that they were retransferred to ALD to use on the Seasons of Sarasota project. But for the transfers of the funds from HEI to ALSL, ALSL would not have been able to make most of the transfers to ALD.

This factor is either inapplicable or does not support a finding that the transfers created bona fide debt.

### 11. Presence or Absence of a Sinking Fund

The failure to establish a sinking fund for repayment weighs against a finding of bona fide debt. See Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics, Inc.), 269 F.3d at 753; Roth Steel Tube Co. v. Commissioner, supra at 632; Lane v. United States, 742 F.2d at 1317; Raymond v. United States, supra at 191; Austin Village, Inc. v. United States, supra at 745.

ALSL did not establish a sinking fund for repayment of the ALSL note. While petitioners invite this Court to disregard this factor, asserting that the Court of Appeals for the Sixth Circuit "is out of touch with economic reality" in relying upon this factor, we decline to do so. As is true with respect to all of these factors, this factor is not controlling in and of itself but is merely one factor that we consider in determining the objectively indicated intent of ALSL and HEI as to the characterization of the transferred funds.

This factor weighs toward a finding that the transfers did not create bona fide debt.

12. Conclusion

On the basis of our review of the entire record, we find it extremely improbable that an arm's-length lender at the time of the transfers would have lent unsecured, at a low rate of interest, and for an unspecified period of time to an entity in ALSL's questionable financial condition. Security, adequately stated interest, and repayment arrangements (or efforts to secure the same) are important proofs of intent, and here such proofs are notably lacking. Economic realities require that HEI's transfers be characterized as capital contributions for Federal income tax purposes, and we so hold. Thus, we also hold that HEI is not entitled to any bad debt deduction with respect to the transfers.

C. Petitioners' Claim to a Deduction for a Loss of Capital

Petitioners argue alternatively that HEI may deduct the transfers as a loss on an abandonment of its equity interest in ALSL. We disagree. We are unable to find in the record that HEI had any equity interest in ALSL, let alone any such interest that it may deduct as a loss.

HEI and its owners and advisers were experienced in many lines of business conducted in many ways. In structuring its involvement in the Seasons of Sarasota project, HEI chose not to

become an owner of ALSL and never became such an owner.  ALSL's owners, on the other hand, who were themselves indirect owners and insiders of HEI, did choose to become ALSL's owners.  They did this not by using their personal funds to pay for their equity but by using HEI's funds.  Distributions by a corporation are treated as dividends to a shareholder (to the extent of the corporation's earnings and profits, see Estate of DeNiro v. Commissioner, 746 F.2d 327, 332 (6th Cir. 1984)) if the distributions are made for the shareholder's personal benefit without any expectation of repayment.  See Hagaman v. Commissioner, 958 F.2d 684, 690-691 (6th Cir. 1992), affg. and remanding T.C. Memo. 1987-549; J.F. Stevenhagen Co. v. Commissioner, T.C. Memo. 1975-198, affd. 551 F.2d 106 (6th Cir. 1977); see also Shedd v. Commissioner, T.C. Memo. 2000-292; Davis v. Commissioner, T.C. Memo. 1995-283.  Such is so even if the funds are not distributed directly to the shareholder.  See Rapid Elec. Co. v. Commissioner, 61 T.C. 232, 239 (1973); see also J.F. Stevenhagen Co. v. Commissioner, supra.

HEI had no equity in ALSL, and HEI's transfers of the funds to ALSL enhanced the controlling settlors' investments in ALSL; e.g., the controlling settlors never made any capital contributions to ALSL from their personal funds but still received interests in ALSL totaling 60 percent.  The transfers also were made without a reasonable expectation of repayment.

Instead, we find in the record that the primary purpose of HEI's transfers to ALSL, an entity controlled by the same individuals who controlled HEI, was to benefit those individuals, see <u>Sammons v. Commissioner</u>, 472 F.2d 449, 451, 456 (5th Cir. 1972), affg. in part, revg. in part on another ground T.C. Memo. 1971-145; <u>Wilkof v. Commissioner</u>, T.C. Memo. 1978-496, affd. 636 F.2d 1139 (6th Cir. 1981); <u>McLemore v. Commissioner</u>, T.C. Memo. 1973-59, affd. 494 F.2d 1350 (6th Cir. 1974), and was without regard to any business purpose or benefit to HEI.[8]

## II. Losses From Equipment Leasing Activities

### A. Overview

During the relevant years, petitioners were connected with the following leasing activities: (1) In 1991, Printographics began the activity concerning the 1991 Rapistan conveyor system; (2) in 1995, Printographics began the activity concerning the 1995 computer system; (3) in 1998, LCL began the activities concerning the 1998 Amtel equipment; (4) in 1999, LCL began the activity concerning the 1999 blisk equipment; (5) in 2000, LCL began the activities concerning the 2000 computer equipment and the 2000 RFC equipment.

---

[8] We need not and do not decide whether the transfers were in fact dividends to HEI's nonparty shareholder. For even if they were not, HEI could not deduct the outlay made primarily for the benefit of its shareholder rather than for a business or investment purpose of its own. See <u>Hood v. Commissioner</u>, 115 T.C. 172, 179 (2000).

B.  Aggregation

Petitioners argue that section 465(c)(2)(B)(i) allows LCL to aggregate its 1998, 1999, and 2000 activities into a single activity for purposes of the at-risk rules of section 465.  (The relevant provisions of section 465(c) are set forth in an appendix to this Opinion.)  Petitioners argue that section 1.465-1T, Temporary Income Tax Regs., 50 Fed. Reg. 6014 (Mar. 11, 1985), interprets section 465(c)(2)(B)(i) to the contrary and assert that these regulations are invalid as inconsistent with the statute.  Respondent argues that the referenced regulations preclude LCL from aggregating one year's leasing activities with another year's leasing activities and asserts that the referenced regulations are consistent with section 465(c)(2)(B)(i).  We agree with respondent that section 465(c)(2)(B)(i) does not allow for the aggregation desired by petitioners.  Because we do not read the referenced regulations to address the issue at hand, we do not discuss them further.

Section 465(c)(2)(A)(ii) generally provides that a taxpayer may not aggregate its equipment leasing activities for purposes of the at-risk rules.  An exception is found, however, in the case of partnerships and S corporations.  Under this exception, all activities of a partnership or S corporation with respect to section 1245 properties are considered to be a single activity to the extent that the "properties are leased or held for lease, and

\* \* \* are placed in service in any taxable year of the partnership or S corporation".  Sec. 465(c)(2)(B)(i).

Petitioners read the quoted text, with a focus especially on the word "any", to mean that all of LCL's equipment leasing activities are viewed as a single activity, notwithstanding the fact that all of the activities did not arise in the same taxable year.  We read that text differently.  While petitioners focus primarily on the single word "any" to support their interpretation, the word "any" may not be construed in isolation but must be construed in the context of the statute as a whole. See Small v. United States, ___ U.S. ___, 125 S. Ct. 1752 (2005); United States v. Alvarez-Sanchez, 511 U.S. 350, 357 (1994). Statutes should be interpreted as a whole to give effect to every clause, sentence, and word therein, see Market Co. v. Hoffman, 101 U.S. 112, 115 (1879), and the duty of a court is to render that type of interpretation whenever possible, cf. United States v. Menasche, 348 U.S. 528, 538-539 (1955); Montclair v. Ramsdell, 107 U.S. 147, 152 (1883).  Such an approach is a "cardinal principle of statutory construction".  Williams v. Taylor, 529 U.S. 362, 404 (2000).

In accordance with that approach, we apply the plain meaning of the words set forth in section 465(c)(2)(B), see Venture Funding, Ltd. v. Commissioner, 110 T.C. 236, 241-242 (1998), affd. without published opinion 198 F.3d 248 (6th Cir. 1999), and

we do so mindful of the statute as a whole.  We conclude that
Congress's use of the word "any" denotes one (i.e., the same)
taxable year and that LCL's aggregated activities are only those
activities that relate to leased personal property placed in
service in the same taxable year.[9]  As we understand petitioners'
contrary interpretation, its effect would be that virtually "all
activities [of a partnership or S corporation] with respect to
section 1245 properties which * * * are leased or held for lease
* * * shall be treated as a single activity."  Petitioners do not
explain how that interpretation does not render section
465(c)(2)(B)(i)(II) surplusage, and we are unable to give such an
explanation either.  Nor do petitioners explain how their
interpretation harmonizes with section 465(c)(2)(B)(ii) and, more
particularly, the reference in that section to section
465(c)(3)(B).  Under petitioners' interpretation, section
465(c)(2)(B)(ii) also would be surplusage in that all equipment
leasing activities of a partnership or S corporation would
already be considered to be a single activity under section
465(c)(2)(B)(i).

Petitioners' reliance on the word "any" to reach their
interpretation also is misplaced.  The word "any" denotes "One,
some, every, or all without specification", The American Heritage

---

[9] By cross-reference from sec. 465(c)(1)(C), sec. 1245(a)
provides that the term "section 1245 property" as used in sec.
465 includes personal property.

Dictionary of the English Language 81 (4th ed. 2000), and Congress's use of the word "any" "can and does mean different things depending upon the setting", Nixon v. Mo. Municipal League, 541 U.S. 125, 132 (2004). In this setting, we simply do not understand Congress's use of that word to establish its intent that section 465(c)(2)(B)(i) allow LCL to treat all of its equipment leasing activities as a single activity regardless of the year in which the equipment was placed in service. The fact that Congress prescribed in the statute the singular form of the word "year" adds to our belief.

While the legislative history underlying the enactment of section 465(c)(2)(B) as applied to section 1245 properties is sparse and of little benefit to our inquiry, see H. Conf. Rept. 98-861, at 1122 (1984), 1984-3 C.B. (Vol.2) 1, 376, we believe that the setting surrounding the enactment of section 465(c)(2)(B) also is consistent with our conclusion. Section 465(c)(2) was enacted as part of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, sec. 432(b), 98 Stat. 814, which changed the aggregation rules for partnerships and S corporations with respect to equipment leasing activities (as well as the other activities listed in section 465(c)(1)) for taxable years beginning after December 31, 1983. Before DEFRA, partnerships and S corporations aggregated all activities within each of five specified categories for purposes of section 465. Thus, a

partnership or S corporation could aggregate all of its leased section 1245 property, while other taxpayers treated each of their properties in that category as a separate activity. As amended by DEFRA, section 465(c)(2) generally requires, except as provided in section 465(c)(2)(B), that partnerships and S corporations separate equipment leasing activities (and the other activities listed in section 465(c)(1)) on a property-by-property basis, as do other taxpayers. If petitioners' interpretation were adopted, permitting all leased section 1245 properties of a partnership or S corporation to be aggregated into one activity for purposes of the at-risk rules, section 465(c)(2), as amended by DEFRA, would largely be ineffective.

We conclude by noting that our interpretation of section 465(c)(2)(B)(i) to refer to a single taxable year rather than all of a taxpayer's taxable years coincides with the views of commentators. Since the enactment of section 465(c)(2)(B), commentators have consistently agreed with the interpretation that we espouse today. See, e.g., Starczewski, 550-2nd Tax Management Portfolio (BNA), "At-Risk Rules" A-18 n.153 ("For the leasing of § 1245 property that is all placed in service in a single taxable year, § 465(c)(2)(B)(i) specifically provides for aggregation.") & A-19 ("The partnership aggregation rule apparently does not apply to a partnership or S corporation that leases equipment that is placed in service in different years.")

(2003); McGovern, "Liabilities of the Firm, Member Guaranties, and the At Risk Rules: Some Practical and Policy Considerations", 7 J. Small & Emerging Bus. L. 63, 81 (Spring 2003) ("Section 465 [more specifically identified in a footnote as section 465(c)(2)(B)] provides that if equipment leasing is carried on by a partnership or subchapter S corporation, all items of equipment that are placed in service during the same taxable year are treated as constituting a single activity."); Pennell, "Separate Treatment of At-Risk Activities Under Section 465 Delayed", 62 J. Taxn. 372 (1985) ("For that category [section 1245 property], aggregation based on the taxable year the properties were placed in service is allowed under the special rule in Section 465(c)(2)(B)."). We have not found (nor have petitioners cited) any treatise or article that sets forth a contrary interpretation.

C. <u>At-Risk Amounts</u>

Petitioners argue that the deficit capital account restoration provision in the revised LCL operating agreement exposed LCL's members to liability for their respective shares of LCL's recourse debt. Respondent argues that this provision was not operative during the relevant years because it required that an LCL member first liquidate its interest in LCL, an event that never occurred during the relevant years. Respondent argues alternatively that the provision, if operative, did not make the

members liable for LCL's recourse obligations in that a third party lender did not under the revised LCL operating agreement have the right to force the members to abide by any obligation that LCL failed to honor. We agree with respondent that LCL's members were not at risk for any of the disputed amounts.

Congress enacted section 465 to limit the use of artificial losses created by deductions from certain leveraged investment activities. Such losses may be used only to the extent the taxpayer is at risk economically. Generally, the amount at risk includes (1) the amount of money and the adjusted basis of property contributed to the activity by the taxpayer and (2) borrowed amounts for which the taxpayer is personally liable. Sec. 465(b).

The aspect of petitioners' dispute with respondent's application of the at-risk rules rests on whether LCL's members may take into account any part of LCL's recourse obligations. We agree with respondent that they may not. The recourse notes signed by LCL were not personally guaranteed by LCL's members, and applicable State (Wyoming) law provides that the members of a limited liability company are not personally liable for the debts, obligations, or liabilities of the company. See Wyo. Stat. Ann. sec. 17-15-113 (LexisNexis 2005). The agreements of LCL also contain no provisions obligating its members to pay LCL's debts, obligations, or expenses. Because LCL's members did

not assume personal liability for the notes, the members are not at risk under section 465(b)(1)(B) and (2)(A) with respect to LCL's recourse obligations. Cf. <u>Emershaw v. Commissioner</u>, 949 F.2d 841 (6th Cir. 1991), affg. T.C. Memo. 1990-246.

Petitioners seek a contrary result, focusing on the deficit capital account restoration provision in section 7.7 of the revised LCL operating agreement. Petitioners argue that this provision made LCL's members personally liable for LCL's recourse obligations for purposes of applying the at-risk rules. We disagree. As observed by respondent, section 7.7 contains a condition that must be met before the deficit capital account restoration obligation arises. In accordance with that condition, an LCL member must first liquidate its interest in LCL before the member has any obligation to the entity. Neither HBW nor HCC liquidated its interest in LCL during the relevant years.

III. <u>Conclusion</u>

We sustain respondent's determinations. We have considered all of petitioners' arguments for holdings contrary to those set forth in this Opinion and have rejected those arguments not discussed herein as meritless. We have considered respondent's arguments only to the extent discussed herein.

<u>Decisions will be entered</u>

<u>for respondent</u>.

APPENDIX

SEC. 465(c).  Activities to Which Section Applies.--

> (1) Types of activities.--This section applies to any taxpayer engaged in the activity of--

>> (A) holding, producing, or distributing motion picture films or video tapes,

>> (B) farming (as defined in section 464(e)),

>> (C) leasing any section 1245 property (as defined in section 1245(a)(3)),

>> (D) exploring for, or exploiting, oil and gas resources or

>> (E) exploring for, or exploiting, geothermal deposits (as defined in section 613(e)(2))

> as a trade or business or for the production of income.

> (2) Separate activities.--For purposes of this section--

>> (A) In general.--Except as provided in subparagraph (B), a taxpayer's activity with respect to each--

>>> (i) film or video tape,

>>> (ii) section 1245 property which is leased or held for leasing,

>>> (iii) farm,

>>> (iv) oil and gas property (as defined under section 614), or

>>> (v) geothermal property (as defined under section 614),

> shall be treated as a separate activity.

(B) Aggregation rules.--

    (i) Special rule for leases of section 1245 property by partnerships or S corporations.--In the case of any partnership or S corporation, all activities with respect to section 1245 properties which--

        (I) are leased or held for lease, and

        (II) are placed in service in any taxable year of the partnership or S corporation,

shall be treated as a single activity.

    (ii) Other aggregation rules.--Rules similar to the rules of subparagraphs (B) and (C) of paragraph (3) shall apply for purposes of this paragraph.

(3) Extension to other activities.--

    (A) In general.--In the case of taxable years beginning after December 31, 1978, this section also applies to each activity--

        (i) engaged in by the taxpayer in carrying on a trade or business or for the production of income, and

        (ii) which is not described in paragraph (1).

    (B) Aggregation of activities where taxpayer actively participates in management of trade or business.--Except as provided in subparagraph (C), for purposes of this section, activities described in subparagraph (A) which constitute a trade or business shall be treated as one activity if --

(i) the taxpayer actively participates in the management of such trade or business, or

(ii) such trade or business is carried on by a partnership or an S corporation and 65 percent or more of the losses for the taxable year is allocable to persons who actively participate in the management of the trade or business.

(C) Aggregation or separation of activities under regulations.--the secretary shall prescribe regulations under which activities described in subparagraph (A) shall be aggregated or treated as separate activities.